1  IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
                 STATE OF OKLAHOMA
2

3  FIRST BANK & TRUST CO.,        )
   an Oklahoma Banking           )
   Institution,                  )
4                                 )
                                  )
5            Plaintiff,           )
                                  )
6        vs.                      )NO. CJ-25-2901
                                  )
7  NGUYEN WIN PROPERTIES, LLC,    )
   et al.,                       )
                                  )
8            Defendants.          )

9

10

11                      *******

12

13

14

15  TRANSCRIPT OF PLAINTIFF'S APPOINTMENT FOR RECEIVER
                        HEARING
16                NOVEMBER 12, 2025
         BEFORE THE HONORABLE TRACY L. PRIDDY
17            ASSOCIATE DISTRICT JUDGE
              TULSA COUNTY, OKLAHOMA
18

19

20

21

22     REPORTED BY:  NICHOLE M. MYERS, CSR, RPR
           Tulsa County District Court
23         500 South Denver Avenue
             Tulsa, Oklahoma  74103
24

25

2

1              A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:     MS. LIZ GEORGE
                          Liz George & Associates
                          8101 South Walker Avenue
4                         Suite F
                          Oklahoma City, OK   73139
5

6  FOR DEFENDANT NGUYEN
7  WIN PROPERTIES, LLC;
   BAO QUOC NGUYEN;
8  PAUL NGUYEN:           MR. BRIAN J. RAYMENT
                          Kivell Rayment & Francis, PC
9                         7666 East 61st Street
                          Suite 550
10                        Tulsa, OK   74133

11

12

13  FOR DEFENDANT APEX
    TITLE & CLOSING
14  SERVICES:             MR. JAMES C. LINGER
                          Attorney at Law
15                        1710 South Boston Avenue
                          Tulsa, OK   74119
16

17

18  FOR HOT COFFEE
    HOMES, LLC:           MR. JAMES W. RUSHER
19                        Albright, Rusher &
                            Hardcastle, PC
20                        15 West 6th Street
                          Suite 2600
21                        Tulsa, OK   74119

22

23  ALSO PRESENT:         MR. DAUNTE SPECHT

24

25

1                       I N D E X

2  W I T N E S S                                    P A G E

3  CECILIA BARRETT (Via Teams)

4     Direct Examination by Ms. George            8
      Cross-Examination by Mr. Rayment            22
5
   CHRISTINE STEED
6
      Direct Examination by Ms. George            26
7     Cross-Examination by Mr. Rayment            33
      Redirect Examination by Ms. George          34
8
   STEVE PARNELL
9
      Direct Examination by Ms. George            36
10    Cross- Examination by Mr. Rayment           40

11 PAUL NGUYEN

12    Direct Examination by Ms. George            41
      Cross-Examination by Mr. Rusher             74
13    Cross-Examination by Mr. Rayment            76
      Redirect Examination by Ms. George         104
14

15    Reporter's Certificate                     129

16 E X H I B I T S                    OFFERED/ADMITTED
   Plaintiff's 1, Facebook post...............16/16
17 Plaintiff's 2, photo.......................16/
   Plaintiff's 3, photo.......................16/
18 Plaintiff's 4, photo.......................16/
   Plaintiff's 5, photo.......................16/
19 Plaintiff's 6, mold report.................19/20
   Plaintiff's 7, electric bill...............21/21
20 Plaintiff's 8, loan 1393...................42/42
   Plaintiff's 9, transaction history 1393....44/44
21 Plaintiff's 10, loan 1391..................45/45
   Plaintiff's 11, transaction history 1391...50/50
22 Plaintiff's 12, transaction history 1589...50/50
   Plaintiff's 13, loan 1589..................46/47
23 Plaintiff's 14, loan 1413..................
   Plaintiff's 15, transaction history 1413...
24 Plaintiff's 16, loan 1434..................52/52
   Plaintiff's 17, mortgage...................57/57
25 Plaintiff's 18, Certain Lending quote......64/64

1  **E X H I B I T S**                    **OFFERED/ADMITTED**

2  Plaintiff's 19, payoff quote..............65/66
   Plaintiff's 20, ASAP loan quote...........66/66

3  Plaintiff's 21, Mabrey Bank statement.....
   Defendant Hot Coffee Homes LLC 22, General

4    Warranty deed...........................75/76
   Plaintiff's 23, email.....................

5  Defendant Nguyen Win Properties 2, email..
   Defendant Nguyen win Properties 3, values.87/

6  Defendant Nguyen Win Properties 4, email.99/100
   Defendant Nguyen Win Properties 5, email.102/102

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          *(Whereupon, the hearing began at 2:52*
2 *p.m.)*
3          THE COURT:  We will be on the record in
4 CJ-2025-2901, First Bank & Trust Company,
5 Plaintiff, versus Nguyen Win Properties, LLC, Boa          2:52PM
6 Quoc Nguyen, AKA Paul Nguyen, et cetera -- or et
7 al., a number of Defendants who are occupants of
8 the parties.  This comes on today for appointment
9 of receiver that was filed by the Plaintiff,
10 First Bank & Trust, and we have an objection on          2:52PM
11 file -- it was filed July 30th of this year --
12 from Nguyen Win Properties and Mr. Nguyen.
13 Counsel may make -- we also have a variety of
14 people in the gallery that I've been told may
15 wish to testify in this matter.  We'll take them          2:53PM
16 one at a time.  And on Teams we have Cecilia
17 Barrett, who is expected to testify as well.
18          So now Counsel may make their
19 appearances for the record.
20          MS. GEORGE:  Do you want us to just          2:53PM
21 speak from the table, Your Honor, or do you want
22 us to --
23          THE COURT:  It's whatever you --
24 whatever you prefer to do.
25          MS. GEORGE:  Lysbeth George on behalf of          2:53PM

6

1  First Bank & Trust Co.                                    2:53PM

2          MR. RAYMENT:  Brain Rayment on behalf of

3  the Defendants Nguyen Win Properties and Paul

4  Nguyen.

5          MR. RUSHER:  Your Honor, James Rusher on    2:53PM

6  behalf of Defendant Hot Coffee Homes.

7          THE COURT:  Thank you.

8          MR. LINGER:  James Linger on behalf of

9  Defendant Apex Title and Closing Services.

10          THE COURT:  Thank you.  All right.        2:53PM

11  Miss George, this is your motion to appoint a

12  receiver.

13          MS. GEORGE:  Yes, Your Honor.  I would

14  just like to make a short statement before I call

15  some of our witnesses so we can let them go and   2:54PM

16  we can get into legal argument afterwards just to

17  set up why the testimony you're going to hear

18  today is relevant to the issue of the

19  receivership.  We are seeking a receivership both

20  under the mortgage document as well as 12 O.S.    2:54PM

21  1551, which provides for the appointment of a

22  receiver under a number of different

23  circumstances.  Today I believe the evidence will

24  show, Your Honor, we're moving under 2(a), which

25  is where it appears that the mortgaged property   2:54PM

1   is in danger of being lost, removed or materially      2:54PM
2   injured.  I believe Counsel for the debtor would
3   argue under (b) that -- that it's a condition of
4   the -- the mortgage hasn't been performed and the
5   property is probably insufficient.  That's not       2:54PM
6   what we're arguing today, Your Honor.  I think
7   the testimony you'll hear today will demonstrate
8   very clearly that the mortgaged property is in
9   danger of being lost, removed or materially
10  injured and that is the basis for which we are       2:55PM
11  moving for receivership.  And I would just point
12  out that A and B are their own grounds.  It is an
13  "or" in the statute.  We don't need to show
14  values of property today or even the condition
15  that the mortgage has not been approved -- been       2:55PM
16  performed, although we can demonstrate that for
17  testimony today as well.  So I just wanted to set
18  the stage of the testimony you'll hear from some
19  of the different property occupants today.  And
20  with that, since we have Miss Cecilia on the          2:55PM
21  line -- Barrett -- like to call her first so we
22  can let her get out of here.
23          THE COURT:  Okay.  And, Miss George, if
24  you wouldn't mind just to slow down a little bit.
25          MS. GEORGE:  Certainly.  I will do that       2:55PM

 1 for our court reporter.                              2:55PM
 2        THE COURT:  I know she can get it and
 3 she could probably take it all down, but she
 4 might get super tired.
 5        MS. GEORGE:  I have a tendency to speak   2:55PM
 6 fast; so feel free to remind me to slow down, but
 7 I will do so.
 8        THE COURT:  All right.  Miss Barrett I
 9 confirmed is able to hear me and she's on online.
10 Miss Barrett.                                        2:56PM
11        MS. BARRETT:  I'm still here.
12        THE COURT:  Okay.  Miss Barrett, if you
13 would please turn on your camera.  Thank you.
14                **CECILIA BARRETT,**
15 having first been duly sworn to testify the          2:56PM
16 truth, the whole truth and nothing but the truth,
17 testified as follows:
18        THE COURT:  Miss George, you may
19 inquire.
20              **DIRECT EXAMINATION**                   2:56PM
21 BY MS. GEORGE:
22 Q    Miss Barrett, thank you so much for
23 appearing today.  When this lawsuit got filed you
24 reached out to my office; correct?
25 A    Correct.                                        2:56PM

1  Q     Okay.  And what property address are you --        2:56PM
2  do you live in?
3  A     2723 North Cheyenne Avenue.
4  Q     And that's one of the properties that you
5  understand to be subject to this lawsuit?               2:57PM
6  A     Yes.
7  Q     Okay.  Why don't you go back a little bit
8  for the Court to explain how you came to be
9  involved with Nguyen Win and this property?  How
10 did you come across Nguyen Win or Paul Nguyen?          2:57PM
11 A     Well, he had several people working for
12 him.  They were making Facebook posts advertising
13 the homes as the lease to own homes, and I was
14 looking for something, you know, cheap, something
15 that didn't require so much of a background since       2:57PM
16 I didn't have the best credit.  And so I found
17 them, and I reached out, and they were giving us
18 basically a list of houses that were available.
19 And we all met up -- it was kind of like a group
20 of us, like a group of six, I think.  And we met       2:57PM
21 up and went around to like the different
22 properties that we wanted.
23        The property that I wanted was advertised
24 as new.  So they said it had new electric, new
25 plumbing, all of these things.  I even asked was        2:58PM

10

1  there any type of lead or anything.  I was told          2:58PM
2  there would be no problems, that it was clean.
3  And so I said, okay, you know, there was a few
4  things wrong with it, but my thing was the
5  plumbing and electricity, as long as it was           2:58PM
6  correct I was okay with it, which I was told it
7  was brand new.  I have a post for that.  And,
8  yeah, that's how I got to them.
9  Q     And, Miss Barrett, if you don't mind, I may
10 interrupt you just to help provide some of the        2:58PM
11 documents that you gave my office.  Did you send
12 my office a copy of the Marketplace -- Facebook
13 Marketplace ad that you found Nguyen Win
14 Properties through?
15 A     I did.                                          2:58PM
16 Q     Okay.
17        MS. GEORGE:  And, Your Honor, if I may
18 approach.  We'll mark this as Exhibit 1, Your
19 Honor.  And this was provided to my office by
20 Miss Barrett.                                         2:58PM
21 Q     (By Ms. George)  And it was this ad that I
22 handed the Court a copy of that caused you to
23 come into contact with Nguyen Win where it talks
24 about seller financing, own this home for less
25 than renting, no qualifications, newly renovated,     2:59PM

1  new windows, new doors, new plumbing.  And it          2:59PM
2  goes on and on and provides down payment and
3  monthly payment amounts.  Is that accurate?
4  A      Yes, that's accurate.
5  Q      Okay.  So after you go visit the properties      2:59PM
6  and decide that you're going to move forward with
7  one, did you sign any -- any documents?
8  A      Well, we went back to his office.  Him and
9  the guy at the time, which was my friend, it was
10 supposed to have been an investment property.           2:59PM
11 But we wound up moving in because the whole
12 process was a mess.  We went there.  We talked
13 about it.  He told us to look over the contract
14 for deed.  I took it home and looked over the
15 contract for deed.  We agreed to it -- we agreed      3:00PM
16 to some of the things.  He told me that he would
17 rewrite some of the things that we needed because
18 we noticed that even though it said new windows
19 and things like that, the windows were not new
20 and the outside of the house was a mess.  But he      3:00PM
21 promised that he would fix it, but we had to pay
22 an extra fee.  And since we had already -- you
23 know, was excited and started the process, okay,
24 you know, that will work.
25        And so the next day is when we had to have     3:00PM

12

1  our deposit.  We gave them the deposit.  And then          3:00PM
2  we was supposed to have met at the bank later
3  that day for the -- to notarize the contract for
4  deed.  He got there before our set time, and he
5  gave them another contract for deed.  And I            3:00PM
6  don't -- you know, I read over the one that I
7  had, but he dropped off another one at the bank.
8  And it was kind of like a rush, almost like -- he
9  got there before us.  We was set to get there
10 like 2:00 or something.  He got there like 12:30,       3:01PM
11 1 o'clock.  And so he dropped it off to them.
12 And then when we got there it was kind of like a
13 rushed situation, oh, well, you have to sign so
14 we can get this notarized today, and I was like,
15 okay.  And, yeah, that's what happened.                 3:01PM
16 Q      Do you recall how much your deposit was?
17 A      Yes.  So originally it was supposed to be
18 8,000 down.  And so we did 8,000 down, but then
19 he said write down the list of things that we
20 need that we wanted done -- even though, as you          3:01PM
21 can see on the post, it said that it had new
22 windows and new doors and light fixtures and all
23 this other stuff.  And when we started to go
24 through the house, we noticed after we got the
25 utilities on that some of the stuff doesn't work.       3:01PM

13

1  And so I said, okay, no big deal.  He said he                    3:01PM
2  would fix it.  So we wrote down a bunch of stuff.
3  He said, well, it's going to be $7,000 extra.
4  And I was told to write it down, you can fix it,
5  you know, on your behalf since it's supposed to                  3:02PM
6  be new anyway.  But again we was already in a
7  contract at this time, so we was like, we don't
8  really have a choice.  And, yeah, so altogether
9  it was 15,000.  It was 8,000 down and he added an
10 extra thousand to the rent until we paid all the                 3:02PM
11 7,000.
12 Q     And you provided my office with a number of
13 photographs that you took.  One appears to be of
14 a wall with some damage.  Another is the outside
15 of the house where a -- like pipe is hanging                     3:02PM
16 down, like water drainage.
17 A     Uh-huh.
18 Q     And then one is of some siding, and one
19 appears to be of the floor.
20       MR. RAYMENT:  I'm going to object to                       3:02PM
21 leading.
22       MS. GEORGE:  I'm just trying to verify
23 that these are the photos that she sent my
24 office.
25       THE COURT:  Does she have a copy of the                    3:02PM

14

```
1   photographs?                                          3:02PM
2   Q    (By Ms. George)  Did you send a number of
3   photographs to my office?
4   A    I did.
5   Q    Could you please describe for the Court --       3:03PM
6        THE COURT:  Miss George, hang on.  I
7   haven't ruled on objection yet.  The objection is
8   sustained as to leading.  And so -- but I -- but
9   I do want to get through this quickly; so --
10       MS. GEORGE:  Yes.                                 3:03PM
11       THE COURT:  -- I'll give you some
12  leeway.  But let's just not describe everything
13  in the photos --
14       MS. GEORGE:  Certainly, Your Honor.
15       THE COURT:  -- right off.                         3:03PM
16  Q    (By Ms. George)  Could you please describe
17  for the Court just very shortly the photos you
18  sent to my office?
19  A    I sent to the photos of things that was
20  supposed to be brand new that was not brand new.      3:03PM
21  The siding was melting.  We paid for it.  He put
22  cheap siding.  It was melting.  He paid for the
23  gutters.  They were falling off.  Supposedly the
24  floors and everything, which the kitchen floor
25  caved in -- and I have four children.  The            3:03PM
```

15

1  ceiling also caved in in the main bedroom.  We          3:03PM
2  had a bunch of mold in the walls when they did
3  decide to redo the boys' room at the time.  And
4  I've had to move because of the mold because me
5  and my son has asthma; so I was sending -- about       3:04PM
6  the plumbing as well, because as you can see from
7  the video, I flushed a toilet and it was coming
8  out of the shower.  And again, I have four
9  children.  It's disgusting.
10 Q     And is that -- was that the state of the          3:04PM
11 property when you moved into it?
12 A     I guess so, yes.  I guess.  Because when we
13 moved there it was all painted and all nice and
14 everything was good.  But when the utilities was
15 on -- when the water started running, it was so        3:04PM
16 much stuff wrong with it.  The electric, right
17 now Antoine is still staying there.  I had to
18 move me and my children because the mold was so
19 bad.  But Antoine still stays there.  The whole
20 side of the house is out of electric.  Like he's       3:04PM
21 changed the fuse and everything, have
22 electricians out.  They said that the wiring was
23 horrible.  The central AC and heat does not even
24 work that was supposed to.  He's heating the
25 house with the stove, and the AC doesn't exist.        3:04PM

16

1  It's not even compatible with the system outside.    3:04PM
2  It's -- yeah.
3  Q      Miss Barrett, did you also send --
4          MS. GEORGE:  Well, let's do this first
5  on the pictures.  Your Honor, if I may approach    3:05PM
6  to provide the pictures she's described.  And,
7  Your Honor, I don't think I did this earlier with
8  the Exhibit 1, the Facebook post, I would move to
9  admit that Facebook post as well as Exhibits 2
10  through 5, the photographs.    3:05PM
11          THE COURT:  Mr. Rayment.
12          MR. RAYMENT:  Your Honor, I don't think
13  these exhibits have been sufficiently identified
14  by the witness.
15          THE COURT:  Exhibit 1 and also 2 through    3:06PM
16  5?
17          MR. RAYMENT:  Yes, Your Honor.
18          THE COURT:  Defendant's Exhibit 1 will
19  be admitted over objection.  And I didn't ask
20  Mr. Rusher, Mr. Linger, do you-all have any    3:06PM
21  objections to the exhibits at this time?
22          MR. LINGER:  No objections, Your Honor.
23          MR. RUSHER:  Your Honor, we have no
24  opinion in any of the exhibits, so --
25          THE COURT:  All right.  Thank you.    3:06PM

17

```
1  Exhibits 2 through 5, I'll take those under          3:06PM
2  advisement with the proper foundation.
3          MS. GEORGE:   Thank, Your Honor.
4  Q    (By Ms. George)  Miss Barrett, did you also
5  provide my office an estimate or a report            3:06PM
6  regarding mold?
7  A    Oh, yes.  I actually sent videos showing
8  how much mold there was.  I got an inspector to
9  come out, which I had to pay for by the way.  I
10 had an inspector come out, and he said it was        3:07PM
11 bad.  It was very bad.  It was in the ceiling.
12 It was in the walls.  It was through the
13 windowsills.  And then it got worse, because like
14 I said, the central heat that was supposed to be
15 there did not exist; so we had to warm up the        3:07PM
16 house through the stove.  And we all know it
17 creates a mist; so it just made it worse.
18 Q    And is the -- do you recall the date of
19 that report by chance on the mold?
20 A    I did -- I did send the estimate.  It's        3:07PM
21 that day that we noticed, you know.  And I also
22 sent videos.  I'm not sure if you can play the
23 videos, but it shows all the water spewing out
24 and -- I mean, it's just coming from everywhere.
25 It's one video that actually shows the pipe         3:07PM
```

18

1  hanging out of the house.  Supposedly it was like        3:07PM
2  new plumbing that he said, but when the person
3  showed us under the house, it was just a hanging
4  pipe.  So that sewage from the second bathroom
5  was just under the house.  And then in the second     3:08PM
6  video you'll see --
7          THE COURT:  Okay.  Thank you,
8  Miss Barrett.  There's not a question going to
9  that; so I just want to stop that now.  Go ahead,
10 Miss George, ask a question.                           3:08PM
11 Q  (By Ms. George)  Miss Barrett, I'm just
12 trying to lay the foundation so I can get this
13 mold report into the court.  Do you have the
14 ability to look up the date on that mold report
15 so I can demonstrate to the Court the document I      3:08PM
16 have in front of me it what you sent me.
17 A    Okay.  Yes.  Hold on a second.
18         MR. RAYMENT:  Your Honor, I'm going to
19 object to any testimony about a document that's
20 not in the courtroom.  We've not even seen it.       3:08PM
21         THE COURT:  You want to respond to that,
22 Miss George?
23         MS. GEORGE:  I couldn't hear.
24         MR. RAYMENT:  I'm objecting to any
25 document that's being referred to that is not in     3:08PM

1   the courtroom for us to view it.                          3:08PM

2          MS. GEORGE:  I just provided him a copy

3   of the document, and I'm waiting for her to

4   verify the date so you can determine

5   authenticity.                                             3:09PM

6          THE COURT:  The objection will be

7   sustained till we've got the proper foundation

8   laid.

9   A     Okay.  This was the mold inspection -- hold

10  on one second.  It's loading.  Okay.  This was    3:09PM

11  November 7th of 2023.

12  Q    (By Ms. George)  And if you could for the

13  Court, please state the name of the person that

14  signed at the bottom of the letter, if you can

15  see that?                                                 3:09PM

16  A     It was Jeffrey Garland.

17         MS. GEORGE:  Your Honor, may I approach?

18         THE COURT:  You may.

19         MS. GEORGE:  I'm handing to you what

20  we've marked as Exhibit 6 that reflects the        3:09PM

21  November 7th, 2023, date at the top and then

22  signed by Jeffrey Garland at the bottom.  I would

23  move to admit that.

24         THE COURT:  Mr. Rayment.

25         MR. RAYMENT:  Do you have a copy?  Okay.    3:10PM

1    This isn't signed.                                          3:10PM
2         MS. GEORGE:  Well, it's -- under
3    sincerely it says his name there that she was
4    just stating.
5         MR. RAYMENT:  Your Honor, based on the     3:10PM
6    testimony, no objection.
7         THE COURT:  Okay.
8    Q   (By Ms. George)  And finally,
9    Miss Barrett --
10        THE COURT:  Exhibit 6 will be admitted.     3:10PM
11        MS. GEORGE:  Thank you, Your Honor.
12   Q   (By Ms. George)  Finally, Miss Barrett, so
13   we can let you go, did you also send me a heat
14   and air bill?
15   A    Yes.                                        3:10PM
16   Q    And if you could, could you tell me the
17   date and the amount of the heat and air bill?
18   A    Yes.  It was April 20 of 2023.  The service
19   date is June 14th of 2023.  The amount is
20   $13,916.00.                                      3:10PM
21        MS. GEORGE:  We've marked that as
22   Exhibit 7, Your Honor.
23   Q   (By Ms. George)  And what did you have to
24   have done that caused you to have to spend
25   $13,000 on the property?                         3:11PM

1  A    Well, that was just the estimate.  We                    3:11PM
2  didn't even get that far because I had to wind up
3  finding a place to move because that's when the
4  ceiling caved in, so -- that was the estimate.
5  And he told us to get the estimate and send it to         3:11PM
6  him, and they did nothing even after I got the
7  estimate.  So I didn't have to spend it, but
8  that's how much it cost for the supposedly
9  brand-new system that was already there,
10 supposedly.                                                3:11PM
11         MS. GEORGE:  Your Honor, we would move
12 to admit Exhibit 7.
13         THE COURT:  Mr. Rayment?
14         MR. RAYMENT:  No objection.
15         THE COURT:  Exhibit 7 will be admitted.      3:11PM
16 Q   (By Ms. George)  Miss Barrett, I don't have
17 any other questions.  Is there anything else that
18 you feel like the Court should know about the
19 properties and your dealing with Mr. Nguyen?
20         MR. RAYMENT:  Objection, Your Honor.         3:11PM
21         THE COURT:  Sustained.
22         MS. GEORGE:  I have no further
23 questions.
24         THE COURT:  Cross-examination.
25         MR. RAYMENT:  Thank you.                     3:12PM

```
 1  Miss Barrett --                                          3:12PM
 2          MS. BARRETT:  Uh-huh.
 3          MR. RAYMENT:  -- I have a few questions
 4  for you.
 5          THE COURT:  You may need to speak up,           3:12PM
 6  Mr. Rayment.
 7          MR. RAYMENT:  Can you hear me?
 8          MS. BARRETT:  Faintly.
 9          MR. RAYMENT:  Okay.  I'm going to try to
10  speak loud so you can hear me.                           3:12PM
11                DIRECT EXAMINATION
12  BY MR. RAYMENT:
13  Q    Didn't you enter into your agreement to
14  move into this property back in 2022?
15          THE COURT:  Can you hear him,                   3:12PM
16  Miss Barrett?
17  A    No.  No.
18          THE COURT:  Why don't you just try to
19  speak into this microphone, pull it closer to
20  you, and just have a seat and talk into that.           3:12PM
21  You can pull it closer.
22  Q  (By Mr. Rayment)  Miss Barrett, can you hear
23  me better now?
24  A    Yes, I can hear you.
25  Q    Okay.  Isn't is true that you entered into        3:12PM
```

1  an agreement with Nguyen Win Properties to move          3:12PM
2  into this home in 2022?
3  A     Yes, uh-huh.
4  Q     That was in July of '22?
5  A     Yes.                                                3:13PM
6  Q     So you were in that property for three
7  years?
8  A     No, I was not in that property for three
9  years.  As I stated, I had to move last year.
10 I've actually been at my new place for a year          3:13PM
11 now.
12 Q     So you were in this place for two years?
13 A     Yes.
14 Q     Okay.  And isn't it true that the down
15 payment you made to Nguyen Win Properties was          3:13PM
16 $5,000?
17 A     No, it wasn't.  It was $8,000 and then
18 $7,000 in increments.
19 Q     The document that Counsel provided from
20 Marketplace doesn't have an address on it.  You        3:13PM
21 mentioned that you went to look at a number of
22 different houses.  Could this Marketplace ad
23 apply to one of the other houses?
24 A     No, it can't because I have the picture of
25 the front view which shows you the address on the      3:13PM

24

1  front in just a different color.                        3:13PM

2  Q     That's not on this exhibit though, is it?

3  A     It is.  If you pay attention to the detail

4  of the house, it's the same exact house.  Like I

5  stated, I got the siding done; so it's going to       3:14PM

6  be a different color and it's going to be

7  different, but the front is the same.  You can't

8  confuse it with anything else.

9  Q     What were your monthly payments?

10 A     1,001.                                           3:14PM

11 Q     The document that you provided from

12 Marketplace shows a property with $819.98 as the

13 monthly payment.  Are you sure --

14 A     Right.

15 Q     -- this is the Marketplace ad that applies      3:14PM

16 to your property?

17 A     So if you pay attention to the contract of

18 the deed, it says that that 800-odd dollars that

19 you're taking about is actually the monthly

20 payment, but he included fees for the insurance      3:14PM

21 and then the taxes.  If you look at the contract

22 of deed, it actually breaks it down on the second

23 page.  So that's self-explanatory.

24 Q     Did you provide the contract for deed to

25 counsel for the bank?                                 3:15PM

```
1   A    Yes, I did.  I actually provided both of        3:15PM
2   them, the one I signed and the one he sent me
3   home to read.
4   Q    Okay.  Very good.
5          MR. RAYMENT:  That's all I have.  Thank         3:15PM
6   you.
7          MS. BARRETT:  Uh-huh.
8          THE COURT:  Anything further,
9   Miss George?
10         MS. GEORGE:  Nothing further, Your             3:15PM
11  Honor.
12         THE COURT:  Thank you, Miss Barrett, for
13  being with us.  I'm going to terminate the call
14  now.
15         MS. BARRETT:  Thank you.                        3:15PM
16         THE COURT:  All right.  Miss George?
17         MS. GEORGE:  Yes, I believe we also have
18  another person who has filed their response -- or
19  their appearance in this case, Christine Steed.
20  If you could call Miss Steed to the stand.            3:15PM
21         THE COURT:  Okay.  All right.
22  Miss Steed, if you'll come up here, ma'am.
23                 CHRISTINE STEED,
24  having first been duly sworn to testify the
25  truth, the whole truth and nothing but the truth,    3:16PM
```

1  testified as follows:                                          3:16PM

2         THE COURT:  Okay.  Go ahead,

3  Miss George.

4                 <u>DIRECT EXAMINATION</u>

5  BY MS. GEORGE:

6  Q    Miss Steed, can you please state your full

7  name for the record?

8  A    Yes, ma'am.  Christine K. Steed.

9  Q    And how did you first get connected with

10 Nguyen Win Properties or Paul Nguyen?                           3:17PM

11 A    I found an ad on Facebook.  And I was

12 living in McAlester, Oklahoma, and my children --

13 my youngest child lived up here.  And I was

14 coming up all the time; so I felt if I could find

15 a house I would be able to get into, then I would  3:17PM

16 not be driving back every week to Tulsa -- from

17 McAlester to Tulsa to visit and to spend time

18 with my daughter -- you know, with my child.

19 Q    So what did you do after you saw the

20 Facebook ad?                                                    3:17PM

21 A    I contacted Mr. Nguyen and said I'd like to

22 see it and did.  And then we went ahead and

23 talked about what it would cost as far as the

24 payment and everything.  So I went ahead and it

25 was a quick -- quick look through, you know.  It   3:18PM

27

1  was freshly done; so it was okay.  It seemed to          3:18PM
2  go very fast, you know, transaction was very
3  fast.  And I was right in the middle of my dad
4  dying; so things were kind of stressful.  But I
5  did come back and I signed papers, I believe,          3:18PM
6  on -- I want to say -- get a date here -- on 8-25
7  of 2019.
8  Q    Okay.  And then what happened once you
9  moved into the home?
10 A    Uh-huh.                                            3:18PM
11 Q    What happened once you moved into the home?
12 A    I was led to believe that this house was
13 going to be --
14       MR. RAYMENT:  Objection, Your Honor.
15 Lack of foundation.  Who led her to believe?          3:19PM
16       THE COURT:  I think it's nonresponsive
17 at this point; so I'll sustain the objection.  Go
18 ahead and ask your question again.
19 Q    (By Ms. George)  Did you discover any issues
20 with the home once you moved in?                        3:19PM
21 A    Yes.  We had plumbing in the bathroom that
22 we had troubles with, and I had asked to have
23 that fixed, and I got no response.  So after a
24 couple of months I said I'll do it myself, and I
25 did fix it because I can't have a bathroom out of       3:19PM

1  service; so I took that.  We have lights          3:19PM
2  flickering through the master bedroom that have
3  totally went out now.

4      I have -- the garage has a thing about this
5  height around (indicating) so I can't put my       3:19PM
6  vehicle in the garage.  So I have a garage, you
7  know, I can't put it in.  I asked when it was
8  going to be done.  I was told he ran out of money
9  in 2019; so I blew it off, you know, everybody
10 had tough times back then with COVID.              3:20PM

11     I know I have mold.  When I contacted
12 Stephanie, which is a young lady that works with
13 him, she had told me there's a year warranty on
14 the home, and I was not aware at the point.  I
15 have several pictures, Your Honor, of the tree     3:20PM
16 that has caused this damage to the property.  It
17 started out with -- I do remember Paul coming out
18 and climbing up on a ladder and my child being
19 there, and he said it was just a small dime-size
20 hole, no big deal; so I blew it off.               3:20PM
21 Unfortunately, it's turned into a very costly
22 both financially, which I can't afford, and --

23         MR. RAYMENT:  Your Honor, I'm going to
24 object to this line of questioning and these
25 answers.  This is a contract for deed.             3:20PM

```
1   A     Yes, sir.  I assumed I was buying this        3:20PM
2   home.
3          THE COURT:  Okay.  Miss Steed, just a
4   moment.  The attorneys are making objections.
5   I'll make a ruling --                              3:21PM
6   A     Okay.
7          THE COURT:  -- and then I'll let you
8   know if you can continue.
9          MR. RAYMENT:  There's no evidence my
10  client was obligated to do repairs to this          3:21PM
11  property.  It was sold.
12         THE COURT:  Sort of.  Okay.
13  Miss George, did you want to respond?
14         MS. GEORGE:  That really wasn't my
15  question, Your Honor.  I was just asking about       3:21PM
16  the condition of the property, which I think is
17  appropriate.  Really all I was trying to
18  establish is we've got problems with these
19  properties.  Whether or not they were the
20  responsibility of the borrower or a contract for    3:21PM
21  deed that may or may not be enforceable and has
22  all sorts of issues without being recorded, et
23  cetera, I think the judge -- that you need to
24  hear about the status of the condition of the
25  properties regardless.                              3:21PM
```

```
 1          THE COURT:  We do need to hear about the    3:21PM
 2  condition of the properties, and so I'm going to
 3  sustain the objection as to anything beyond --
 4  instructing the response beyond the condition of
 5  the property.  You may ask your next question.    3:22PM
 6          Miss Steed, wait for Miss George to ask
 7  you a question.
 8  A     Yes, ma'am.
 9  Q    (By Ms. George)  Could you please
10  describe -- I believe you were starting to    3:22PM
11  discuss the issue with the tree.  Could you
12  please describe for the Court the condition of
13  the roof and the damage that's been caused by the
14  tree, specifically just that issue?
15  A     The tree laid on top of the roof, which    3:22PM
16  caused damage, made a hole in the roof.  And I
17  now have major amounts of mold that is in my
18  master bedroom.  And here's an exhibit of what
19  I'm living in.  Just right here (indicating) is
20  the hole.  And when it rains or snows or    3:22PM
21  anything, that physically is above my bed.  I am
22  allergic to mold and penicillin; so it's been
23  devastating on my breathing, headaches, fatigue,
24  things like that that make me sick.
25          MR. RAYMENT:  Your Honor, I'm going to    3:22PM
```

31

1   object.   This is not responsive to any question.        3:22PM

2            THE COURT:   Sustained.

3   Q    (By Ms. George)   Has the damage to the roof

4   caused issues on the internal part of the home?

5   A     Yes.                                                3:23PM

6   Q     And what issues has that caused?

7   A     The master bedroom, the ceiling.   The whole

8   roof needs to be replaced.   It's very bad.

9   Q     And when did those issues begin?

10  A     I didn't really notice it when we looked at       3:23PM

11  it because I was -- it was quickly rushed through

12  and everything was quickly done.   And then

13  everybody went.   And then later somebody, a

14  neighbor said to me, your roof is buckling.   And

15  I thought, what?   And if you stand out in the        3:23PM

16  street, you can actually see how it's doing it.

17  Q     Have you ever been threatened to be evicted

18  from your home?

19            MR. RAYMENT:   Objection, Your Honor.

20  Leading.                                               3:23PM

21            THE COURT:   Overruled.

22  A     I have been told that if I -- I don't know

23  how you want me to answer this.   I've had contact

24  with the -- I don't know how to answer that.

25  Basically he comes across as it has to be a            3:24PM

```
 1  certain way, and if you buck the system, then          3:24PM
 2  you're in trouble.
 3  Q    (By Ms. George)  Are you --
 4          MR. RAYMENT:  Objection, Your Honor.
 5  Nonresponsive.                                          3:24PM
 6          THE COURT:  Sustained.
 7  Q    (By Ms. George)  Are you aware of a Facebook
 8  group where a number of the property owners for
 9  Nguyen Win are members?
10  A    No, ma'am.                                         3:24PM
11  Q    Okay.  Is there any other damage to the
12  property that we haven't discussed?
13  A    The main thing that's right now is the
14  electric in the home is outdated.  I was unaware
15  of that.  And this house is completely being          3:24PM
16  taken over by mold.
17          MS. GEORGE:  And, Your Honor, I would
18  just ask that the Court take judicial notice of
19  Miss Steed's pleading that she filed on, it looks
20  like, July 28th -- or 25th, the stamp is a             3:25PM
21  little -- where she says this in writing but also
22  has a copy of the contract for deed to reference
23  that.
24          THE COURT:  I have her response, yes.
25          MS. GEORGE:  Thank you.  With that, I           3:25PM
```

33

 1  have no further questions for this witness, Your          3:25PM
 2  Honor.
 3          THE COURT:  Thank you.  Any
 4  cross-examination?
 5          MR. RAYMENT:  Yes.  Thank you, Your          3:25PM
 6  Honor.
 7                **CROSS-EXAMINATION**
 8  BY MR. RAYMENT:
 9  Q    Miss Steed, how long have you lived in this
10  property?                                                3:25PM
11  A    Seven years, sir.  I moved in -- I
12  purchased the property on -- I signed the papers
13  on 8-25 of '19.  I flew back to Denver and my dad
14  passed away.  I flew right back and got
15  everything ready and moved from McAlester,               3:25PM
16  Oklahoma, to the property at 71 North Florence
17  Avenue.
18  Q    And Nguyen Win Properties has allowed you
19  to stay in this property during that period of
20  time?                                                    3:26PM
21  A    I've been paying, Your Honor, every single
22  month.
23  Q    Right.  Right.  But Nguyen Win has not
24  disturbed your occupancy; correct?  They haven't
25  made you move out, they haven't done anything --         3:26PM

```
 1   A      No.  I've had different texts at times that    3:26PM
 2   they aren't really polite and nice, but, you
 3   know, just -- it's my residence.  It's where I
 4   thought I was going to go until I passed away.
 5   Q      And you've been able to use it as a             3:26PM
 6   residence for seven years?
 7   A      I live in a guest room, yes, sir.
 8          MR. RAYMENT:  Nothing further, Your
 9   Honor.
10          THE COURT:  Thank you.  Any re-cross --         3:26PM
11   or redirect?
12          MS. GEORGE:  Just one follow-up
13   question.
14              REDIRECT EXAMINATION
15   BY MS. GEORGE:                                         3:26PM
16   Q      You mentioned some texts that weren't very
17   nice.  Can you please elaborate on that for the
18   Court?
19          MR. RAYMENT:  Your Honor, I'm going to
20   object to that.  That wasn't even responsive to       3:26PM
21   my question.
22          THE COURT:  I'll allow it.  Go ahead.
23   A      A couple -- I guess about a month ago I
24   was -- I was -- I was texting and this was
25   stating that there was a gentleman going to come      3:27PM
```

```
 1  out and do an inspection and appraisal on this      3:27PM
 2  house.  And I thought, for what reason?  And I
 3  didn't know the gentleman because I didn't know
 4  them.  And they have no business card, no uniform
 5  of any sort that would say any company they         3:27PM
 6  worked for.  And I'm there all day long by myself
 7  with my service dog; so I feel very uneasy just
 8  opening the door for somebody.  But basically
 9  it's the same thing.  He wants something, and he
10  wants it to be right.                               3:27PM
11          THE COURT:  Okay.  Thank you,
12  Miss Steed.
13  A    I don't know how to --
14          THE COURT:  Appreciate it.  Anything
15  else?                                               3:27PM
16          MS. GEORGE:  Nothing further, Your
17  Honor.
18          THE COURT:  Thank you.  Any recross?
19          MR. RAYMENT:  No, Your Honor.
20          THE COURT:  Thank you.  Thank you,          3:27PM
21  Miss Steed.  Take your time getting down.
22          Miss George, do you have any other
23  witness?
24          MS. GEORGE:  I think with we have one
25  additional party that is named as a defendant as   3:28PM
```

1  well, Mr. Parnell.  I will call to the stand                3:28PM
2  Mr. Steve Parnell.
3          THE COURT:  Okay.  Mr. Parnell.
4                **STEVE PARNELL,**
5  having first been duly sworn to testify the                 3:29PM
6  truth, the whole truth and nothing but the truth,
7  testified as follows:
8          THE COURT:  Mr. Parnell, if you will
9  scoot up.
10         You may inquire, Miss George.                        3:29PM
11         MS. GEORGE:  Thank you, Your Honor.
12               **DIRECT EXAMINATION**
13 BY MS. GEORGE:
14 Q    Mr. Parnell, can you please state your full
15 name for the record?
16 A    Steve Douglas Parnell.
17 Q    And do you have an understanding why your
18 name is included as a defendant in this case?
19 A    Actually, no.
20 Q    Okay.  Do you have a judgment against          3:29PM
21 Nguyen Win?
22 A    I do not.
23 Q    Have you asserted a claim or filed any
24 liens with respect to Nguyen Win?
25 A    No.                                             3:29PM

37

```
1  Q     And have you owned properties -- or have          3:29PM
2  you been in a contract for deed or had a loan
3  with Nguyen Win previously?
4  A     I did, yes, on my property.
5  Q     Okay.  If you could describe for the Court        3:29PM
6  how you came -- similar to the other witnesses
7  you've heard, how you came to connect with Nguyen
8  Win.
9  A     Okay.  I had some property in Mounds,
10 Oklahoma, had eight acres.  And I had a              3:30PM
11 construction note through Green Country.  And I
12 had left my place of employment.  So in doing
13 that, it came pretty tight as far as the funds;
14 so I was looking for an investigator to kind of
15 help through that situation.  My son came across    3:30PM
16 Paul Nguyen and Nguyen Win; so we had signed a
17 contract.
18 Q     Do you know how he came across Nguyen Win?
19 Was it through a Facebook post or other
20 circumstance?                                        3:30PM
21 A     I don't think so.
22 Q     Okay.
23 A     I don't think so.  And so what he had
24 purchased was a construction note.  It wasn't a
25 permanent -- because I didn't even have a            3:30PM
```

1  permanent -- I wasn't complete with a house.  And          3:30PM
2  so in doing, we signed a contract and 2500 a
3  month and with the agreement -- with the
4  understanding that I was going to be able to sell
5  the property.  He'd win.  I'd win.  And we'd be          3:31PM
6  able to move on down the road.  But in 2022 I
7  received a notice that I was being evicted so --
8  they won judgment and -- Creek County.
9  Q     Okay.  And what was your understanding when
10 you entered into that contract?  Was he placing a          3:31PM
11 mortgage on your house at that time?
12 A      Well, the house was not complete.  I was
13 living on the property, but the house wasn't
14 complete.  So with that -- my understanding,
15 being a construction note, that the house had to          3:31PM
16 be complete, they were sending individuals to the
17 property monthly because under that contract they
18 actually would come out to see any repairs on the
19 portion that he signed.  He was supposed to make
20 some repairs.  Well, it didn't happen because          3:32PM
21 they sent Lindsey and the -- her manager out to
22 inspect the property.  And they'd been out there
23 a bunch, and they said he hasn't touched any of
24 it.  I said no.  He told them he had, but it
25 never happened.  You talk about the kitchen, both          3:32PM

```
 1  bathrooms, and I already had the paperwork for    3:32PM
 2  all that.  I installed all the work because I was
 3  part of the contract group.  So you started
 4  seeing the writing on the wall, and I made a
 5  mistake.                                           3:32PM
 6  Q    I know you're here because you wanted the
 7  judge to hear from you.
 8          MS. GEORGE:  I know he's not represented
 9  by counsel, but if he's got anything else he
10  would like to present to the Court, I would like   3:33PM
11  to give him the opportunity to do that.
12          MR. RAYMENT:  I would object to that,
13  Your Honor.  It just opens up the floor to say
14  whatever he wants to say.
15          THE COURT:  That will be sustained on      3:33PM
16  that objection unless there's a specific question
17  to Mr. Parnell.
18          MS. GEORGE:  I don't think I have
19  anything further, Your Honor.  I pass the
20  witness.                                           3:33PM
21          THE COURT:  Thank you.  Mr. Rayment,
22  cross-examination?
23          MR. RAYMENT:  Yes, Your Honor.
24
25                                                     3:33PM
```

40

<u>**CROSS-EXAMINATION**</u>                           3:33PM

1

2 BY MR. RAYMENT:

3 Q    Mr. Parnell, isn't it true -- I believe you

4 testified on this -- Nguyen Win Properties got a

5 judgment against you?                              3:33PM

6 A    Yes.

7 Q    And that judgment is still outstanding;

8 correct?

9 A    Yes.

10       MR. RAYMENT:  That's all I have, Your     3:33PM

11 Honor.

12       THE COURT:  Thank you.  Redirect?

13       MS. GEORGE:  Nothing further, Your

14 Honor.

15       THE COURT:  Thank you for being here,    3:33PM

16 Mr. Parnell.  You may step down.

17       Miss George, do you have anyone else?

18       MS. GEORGE:  Yes, I would call Mr. Paul

19 Nguyen to the stand.

20              <u>**PAUL NGUYEN,**</u>                 3:34PM

21 having first been duly sworn to testify the

22 truth, the whole truth and nothing but the truth,

23 testified as follows:

24       THE COURT:  When you're ready, Miss

25 George.                                            3:34PM

<u>**DIRECT EXAMINATION**</u>

1                                                                          3:34PM
2   BY MS. GEORGE:
3   Q     Mr. Nguyen, could you please state your
4   full name for the record?
5   A     Bao Quoc Nguyen.                                                 3:34PM
6   Q     Would you mind if I call you Paul?
7   A     Yeah, you can.
8   Q     Thank you.
9         THE COURT:  Or Mr. Nguyen.
10        MS. GEORGE:  Certainly.  Yes, that's         3:34PM
11  more appropriate, Your Honor.  Thank you.
12  Q   (By Ms. George)  Mr. Nguyen, what is your
13  affiliation with Nguyen Win Properties, LLC?
14  A     The owner.
15  Q     Are you the sole owner?                                          3:35PM
16  A     I am.
17  Q     And how long have you owned and operated
18  Nguyen Win Properties?
19  A     Ten years probably.
20  Q     Okay.  And at some point did you enter into    3:35PM
21  a financing agreement with my client, First
22  Bank & Trust?
23  A     I did.
24  Q     Okay.  I'm going to hand you a few
25  documents and we'll -- I guess I should -- I'd      3:35PM

42

1  like to speed up things for Your Honor.                    3:35PM
2  Mr. Rayment, do you have any objection to
3  admitting the notes and mortgages for the judge
4  or do you want me to walk him through those?
5          MR. RAYMENT:  No, Your Honor, I believe    3:35PM
6  we acknowledged those in our answer.
7          THE COURT:  I'm sorry?
8          MR. RAYMENT:  I believe we acknowledged
9  the notes and the mortgages in our answer.
10         MS. GEORGE:  I just wanted to speed that    3:35PM
11 up.  So Your Honor can take notice of those; so I
12 won't walk Mr. Nguyen through the notes and
13 mortgages.
14         THE COURT:  Thank you.
15 Q   (By Ms. George)  Mr. Nguyen, let's talk        3:36PM
16 about the status of each of those loans.  First
17 let's talk about loan number 1391.  I'm going to
18 hand you the note just so you don't have to do
19 this from memory.  Sorry, I'll actually hand you
20 1393 first.  Could you tell the Court what the    3:36PM
21 principal amount of this note is?
22 A   About $4,799,050.
23         MS. GEORGE:  And for the Court's record,
24 we'll mark this as Exhibit 8.  And I would move
25 to admit Exhibit 8 based on the stipulation       3:37PM

43

1  entered.                                              3:37PM

2          THE COURT:  Exhibit 8 will be admitted.

3  Q    (By Ms. George)  And if you would look under

4  the payment line, the payments on this note were

5  approximately 29,000 and some change; is that        3:37PM

6  correct?

7  A    Yes.

8  Q    And you were supposed to make 240

9  installments?

10 A    Yes.                                             3:37PM

11 Q    Do you know the last date on which you made

12 a loan payment on loan number 1393?

13 A    I do not know the exact date.

14 Q    I'll hand you what we'll mark as Exhibit 9.

15 A    Uh-huh.                                          3:38PM

16 Q    This is going to be the transaction history

17 for loan 1393.  Are you able to read through that

18 and identify the date of the last payment?  Is

19 there a principal payment made on 2-23 of '25?

20 A    No.  No.                                         3:39PM

21         THE COURT:  2-3?

22 Q    (By Ms. George)  2-3-2025?

23 A    Yes.

24 Q    Do you see that there?

25 A    I do.                                            3:39PM

44

1  Q     Where it goes payment towards principal and
2  interest?                                                    3:39PM
3  A     Correct.
4  Q     And what does it show under the due column?
5  What date is under the due column?                           3:39PM
6  A     I don't -- 1229.
7  Q     And have you made a payment since February
8  of 2025?
9  A     I tried to.  You wouldn't accept it.
10 Q     And at this time in February the loan was            3:39PM
11 past due as of December; correct?
12 A     Not to my knowledge, no.
13 Q     That is what this record reflects though;
14 correct?
15 A     This is what this paper says, yes.                    3:39PM
16       MS. GEORGE:  Your Honor, I would move to
17 admit Exhibit 9, this transaction history from
18 loan 1393.
19       MR. RAYMENT:  Your Honor, I don't
20 believe this witness has identified this                     3:40PM
21 document; so I'd object.
22       THE COURT:  I'm going to allow it.
23 Exhibit No. 9 will be admitted.
24 Q   (By Ms. George)  And then let's move on to
25 our next loan.  This will actually be 1391.               3:40PM

1  We'll mark this as Exhibit 10.  And what is the          3:40PM
2  principal amount on this loan?
3  A     296,000.
4  Q     And then on the payment line, do I see
5  correctly that the monthly payments are                 3:40PM
6  approximately 1800 and some change?
7  A     I can't read it.  Yeah, I can't read.
8  Q     Does -- is the amount 1800 familiar to you
9  with respect to this loan?
10 A     Yes.                                               3:41PM
11 Q     Okay.  And I will hand you what we'll
12 mark -- oh, I'm sorry.  Will you mark that
13 Exhibit 10?  And this is a note; so we will ask
14 that be admitted under the stipulations.
15       THE COURT:  Exhibit 10 is admitted.               3:41PM
16 Q   (By Ms. George)  Okay.  And then I will next
17 hand you transaction history for loan 1391, which
18 we'll mark as Exhibit 11.  And again at the top
19 here do you see the payment on 2-28-25 of
20 principal and interest?                                  3:42PM
21 A     I do.
22 Q     Okay.  And have you made a payment since
23 that time?
24 A     I tried to, yes.
25 Q     But you haven't actually made a payment;          3:42PM

46

1  correct?                                              3:42PM
2  A      I put money in the account to make a
3  payment, yes.
4  Q      But did you make a payment towards the loan
5  or did you put money in a bank account?             3:42PM
6  A      I put money in the bank account for the
7  payment, and you guys took it out and did
8  something else with it.
9  Q      Do you have evidence of that?
10 A      I do.                                         3:42PM
11 Q      You have evidence of the payment?
12 A      Correct.
13 Q      And you're going to present that to the
14 Court today?
15 A      Yeah.                                         3:42PM
16 Q      Okay.  I'll let your counsel handle that.
17        We'll mark the next note, Your Honor, which
18 is going to be --
19        MS. GEORGE:  Sorry, Your Honor, I have
20 way too many pieces of paper over here.              3:43PM
21 Q    (By Ms. George)  I'll go ahead and hand you
22 this payoff -- or the note history on this while
23 I'm getting the note pulled.  This is going to be
24 the payment history on 1589.  We'll mark this as
25 Exhibit 12.  We'll mark this as Exhibit 12.  And     3:43PM

47

```
 1  then I'll also hand you what we'll mark as        3:44PM
 2  Exhibit 13, which is the remaining note.
 3          MS. GEORGE:  Your Honor, we would move
 4  first to admit Exhibit 13 with the stipulation
 5  under the note.                                    3:44PM
 6          THE COURT:  13 will be admitted.
 7  Q    (By Ms. George)  Mr. Nguyen, what is the
 8  principal amount of the loan ending in 1589?
 9  A    600,000.
10  Q    And then if you look at the payment          3:44PM
11  statement on this one, it states that -- that
12  this loan will be paid in one payment outstanding
13  principal plus all accrued interest on
14  October 16th, 2024; is that correct?
15  A    I don't know that -- mortgaged property --   3:45PM
16  I can't read it, the writing is way too small.
17  Q    Okay.  Would you disagree with me if I read
18  to you that it says, borrower will pay this loan
19  in one payment plus all accrued unpaid interest
20  on October 16th, 2024?  Do you have any reason to  3:45PM
21  disagree that that's what this note says?
22  A    Well, yeah.  It was --
23  Q    Yeah, you disagree?
24  A    I disagree.
25          MS. GEORGE:  Your Honor, are you able to   3:45PM
```

```
 1  read it?                                                3:45PM

 2          THE COURT:  What paragraph?

 3          MS. GEORGE:  Under payment, the second

 4  paragraph, that full sentence.

 5          THE COURT:  I do see that.                       3:46PM

 6  Q    (By Ms. George)  And then if we look at

 7  Exhibit 12, the payment history, do you see the

 8  balance outstanding at the top there on

 9  1-16-2025, does that show 600,000 still unpaid?

10  A    Yes.                                                3:46PM

11  Q    Okay.  The payment history.

12  A    Yes.

13  Q    And so you did not in fact pay this loan

14  off on the due date of October of 2024, did you?

15  A    I was not allowed to pay on it, so --            3:46PM

16  Q    Did you attempt to present the full balance

17  on that note in accordance with the terms that I

18  just read?

19  A    I didn't know it was due.  Actually, it was

20  supposed to be a line of credit that was renewed    3:46PM

21  so -- but then -- yeah, we started having

22  problems with my banker there.

23  Q    My question was did you pay the $600,000?

24  Yes or no.

25  A    I wasn't allowed to pay the $600,000.           3:47PM
```

49

1   Q     And when you turn to the second page of          3:47PM
2   your promissory note, is that your signature on
3   page two?
4            THE COURT:  We're back on Exhibit 13.
5   A     It doesn't look like it, no.                     3:47PM
6   Q     (By Ms. George)  So you are testifying today
7   that you did not sign that note?
8   A     I'm saying that that is not my signature.
9   Q     Did you receive $600,000 from the bank on
10  this line of credit?                                   3:47PM
11  A     Yes.
12  Q     Okay.  Who else would have signed on your
13  behalf on this note?
14  A     Nobody is authorized to.
15  Q     But you did receive the money?                   3:47PM
16  A     Well, yes.
17  Q     So you're not disputing that you entered
18  into a note with the bank?
19  A     Correct.
20  Q     Okay.  I'll hand you the last promissory        3:47PM
21  note.  This is going to be the note ending in
22  1413.  And we'll mark that as Exhibit 14.  What's
23  the balance on that note?
24  A     $100,429.
25  Q     I'm sorry, go ahead.  And could you -- if       3:48PM

1  you're able -- again, I know it's hard and it's      3:48PM
2  small writing -- under the payment would you
3  agree that this is for 240 payments $624.49 each?
4  A      Sounds correct.
5  Q      Okay.  And do you agree that you entered      3:48PM
6  into this note?
7  A      Yes.
8  Q      Okay.  I'll hand you the transaction
9  history --
10         MS. GEORGE:  Your Honor, I don't think I      3:48PM
11 moved to admit the last transaction history,
12 which was Exhibit 13 [sic].  I would move to
13 admit both of those transaction histories.
14         MR. RAYMENT:  What, please?
15         THE COURT:  Excuse me?  What I have is      3:49PM
16 Exhibit 11, which is the transaction history for
17 1393 and also the transaction history, Exhibit
18 No. 12 for 1589.
19         MS. GEORGE:  I would move to admit both
20 of those, Your Honor.      3:49PM
21         THE COURT:  Mr. Rayment?
22         MR. RAYMENT:  Again, I don't believe
23 they've been identified properly.
24         THE COURT:  He's testified as to the
25 contents; so they will be admitted.      3:49PM

51

1          MS. GEORGE:  Your Honor, I've handed you          3:49PM
2    what we've marked as the final transaction
3    history for 1589.
4    Q    (By Ms. George)  Mr. Nguyen, do you see the
5    last principal and interest payment on this note          3:49PM
6    for 2-28 of '25 reflected on Exhibit 15?
7    A    I don't know.  Which one's Exhibit 15?
8    Q    I'm sorry, the loan transaction history for
9    Loan No. 1413.
10   A    I don't know which one of these it is.          3:50PM
11   Q    Up at the top, does it say 1413 that I just
12   handed you.
13   A    Okay.  Yeah.
14   Q    And do you see the payment on 2-28-25 is
15   applied the principal and interest?          3:50PM
16   A    Yes.
17   Q    Have you made a payment since such time?
18   A    I tried to, yes.
19   Q    I didn't ask you if you tried to.  Did you
20   make a payment that was credited towards this          3:50PM
21   loan?
22   A    I tried to and you wouldn't accept it; so
23   I -- I don't understand your question.
24   Q    I think you've answered it.
25        Okay.  With respect to each of these loans,          3:50PM

1  do you recall entering into business loan                     3:50PM
2  agreements?
3  A      Yes.
4  Q      I'll hand you a copy of one so you can take
5  a look at it.                                                  3:50PM
6          MS. GEORGE:  This would be Exhibit 16,
7  Your Honor.  And we would move to admit
8  Exhibit 16 pursuant to the parties' stipulation
9  of the loan documents.
10         THE COURT:  16 will be admitted.                       3:51PM
11 Q    (By Ms. George)  On the business loan
12 agreement, does this document look familiar to
13 you, sir?
14 A      Yeah.
15 Q      And if you'd flip to page five, please.  Do    3:51PM
16 you see the section entitled notices?
17 A      Which page?
18 Q      Page five.  It's numbered at the top.
19 Okay.  It's about three -- three or four
20 paragraphs down.  It starts with notices in bold.   3:52PM
21 I'll read it and see if you agree with me.  For
22 notice purposes, borrower agrees to keep lender
23 informed at all times of borrower's current
24 address.  Would you agree that this loan
25 agreement contains that statement?                    3:52PM

```
 1   A      Yes.                                               3:52PM
 2   Q      Okay.  Okay.  I think this will probably be
 3   the last document we need to look at.  This is
 4   Exhibit 13 [sic].  This is just an example for
 5   the Court of one of the mortgages.  We would move   3:52PM
 6   to --
 7            MR. RAYMENT:  Did you say 13?
 8            MS. GEORGE:  17.  Sorry, 17.  Thank you,
 9   Brian.
10   Q    (By Ms. George)  And do you agree that you      3:53PM
11   entered into mortgages with respect to each of
12   the four loans we discussed today?
13   A      Yes.
14   Q      Okay.  And if you would look at the -- kind
15   of second full, full paragraph that starts with    3:53PM
16   cross-collateralization.  Do you see that?
17   A      I do.
18   Q      And do you understand that that means that
19   all of the notes you have with the bank are
20   collateralized by all the collateral that you       3:53PM
21   have with the bank?  Do you have a general
22   understanding of that?
23   A      I do.
24   Q      Okay.
25   A      Now --                                         3:53PM
```

1  Q     Okay.  Then the next paragraph is                    3:53PM
2  assignment of rents.  Do you see that as well?
3  A     Yes.
4  Q     And do you understand that you assigned
5  your rights to collection of the rents on all of          3:53PM
6  these properties as part of your mortgage?
7  A     If I did something wrong, yes.
8  Q     My question is:  Do you understand that
9  this document includes an assignment of rents?
10 A     Correct.                                              3:54PM
11 Q     Okay.  Do you know, as you sit here today,
12 how many of the properties that are subject to
13 the loans of the bank have contracts for deed
14 with them or have tenants?
15 A     I do.                                                 3:54PM
16 Q     How many of those properties?
17 A     I don't know the exact number, but, I mean,
18 I understand that they have people and tenants in
19 them, buyers.
20 Q     And so, for example, on loan -- I think             3:54PM
21 it's 1393, the larger one that's got almost 50
22 properties on it.  Are all 50 of those -- do all
23 50 have contracts for deed or are some of those
24 properties vacant?
25 A     Some -- some are vacant.                              3:54PM

1  Q     Do you lease any of these properties to          3:54PM
2  people or do you just provide -- do contracts for
3  deed?
4  A     We do both.
5  Q     Okay.  Are any of these properties subject        3:55PM
6  to leases?
7  A     Yes.
8  Q     Okay.  And have you provided the bank with
9  copies of your contracts for deed and leases?
10 A     I have.                                            3:55PM
11 Q     Have you provided them all of them?
12 A     I guess no?
13 Q     And have you recorded any of these
14 contracts for deed?
15 A     No.                                                3:55PM
16 Q     Okay.  Are you aware if any of the
17 properties -- or I'm sorry.  You are aware that a
18 number of properties that are secured by the bank
19 have damages and repairs that need to be made to
20 them?                                                    3:55PM
21 A     I do not.
22 Q     You've never been contacted by any of these
23 folks to have repairs made?
24 A     Not that I'm responsible for.
25 Q     That wasn't my question.  Have you ever            3:55PM

```
 1  been contacted about damage or repairs to any of        3:55PM
 2  the properties?
 3  A      Their house?  Sure, yes.
 4  Q      Okay.  And so you are aware that a number
 5  of the properties secured by my client's mortgage        3:56PM
 6  have -- are in a condition that needs repair?
 7  A      No.
 8  Q      So you've made those repairs or have
 9  required the tenants to make those repairs?
10  A      I don't -- I repair for all my tenants,          3:56PM
11  yeah, but not any of the contract for deeds, no.
12  Q      Okay.  So on the contract for deed you
13  don't provide repairs; correct?
14  A      No.  They buy them as is.
15  Q      Okay.  And so when someone like the Steeds       3:56PM
16  has reached out to you about repairs, you've not
17  made those repairs?
18  A      Correct.  Five years later, I'm not going
19  to fix a tree on a house --
20  Q      Okay.                                            3:56PM
21  A      -- that's not mine.
22  Q      So if I -- if I ask you then:  Are you
23  aware of damage to properties that are secured by
24  the bank's mortgage, the Steed's property is
25  damaged; correct?                                       3:57PM
```

1   A      I don't know that.                                    3:57PM

2   Q      But you just testified that if there's

3   damage to a tree, you're not going to fix it.

4   Have you been by there to see if there is damage?

5   A      I have not.                                           3:57PM

6   Q      Okay.  But you are the responsible party to

7   ensure that the bank's collateral is kept in a

8   good condition; correct?

9   A      I am responsible for my mortgage payment.

10  Q      Okay.                                                 3:57PM

11  A      To pay it.  I can't be responsible for

12  their house.

13  Q      Okay.  Let's look at that mortgage that I

14  handed you a moment ago.

15  A      Sure.                                                 3:57PM

16         MS. GEORGE:  And, Your Honor, I'm not

17  sure if I moved to admit the mortgage, but I

18  would do so as the same stipulation as the other

19  loan documents.

20         THE COURT:  Exhibit 17 will be admitted.              3:57PM

21         MS. GEORGE:  Yes.  Thank you, Your

22  Honor.

23  Q   (By Ms. George)  You're familiar with

24  mortgages.  You enter into them on a regular

25  occasion; correct?                                           3:57PM

```
 1   A     Yes.                                            3:58PM
 2   Q     Okay.  If you'd flip to page two of the
 3   mortgage that I handed you a copy of.  Do you see
 4   towards the bottom, possession and maintenance of
 5   the property?                                         3:58PM
 6   A     Uh-huh.
 7   Q     Do you see the paragraph beginning with
 8   duty to maintain?
 9   A     Yeah.
10   Q     I'll read that for the Court.  Grantor        3:58PM
11   shall maintain the property in tenantable
12   condition and promptly perform all repairs,
13   replacements and maintenance necessary to
14   preserve its value.  Your testimony is you've
15   refused do that?                                      3:58PM
16   A     No.
17   Q     Okay.  Yet you were contacted by house a
18   tree -- a house with a tree on it.  You said
19   you're not going to make repairs to a home that
20   you sold five years later.                            3:58PM
21   A     It was -- yeah, they're responsible for
22   them because I make them responsible for that.
23   Q     Whose name is on this mortgage?
24   A     It's my name and I'm responsible for the
25   mortgage.                                             3:58PM
```

```
 1  Q     Okay.  And the mortgage requires you --        3:58PM
 2  A     To pay.
 3  Q     -- to maintain the property under the
 4  section we just read; correct?
 5  A     I suppose so.                                   3:59PM
 6  Q     How do these people come to you when you're
 7  entering into these contracts for deed?  Is it
 8  these Facebook Marketplace ads that are shown or
 9  do you have a team that is doing your marketing
10  for you?                                             3:59PM
11  A     Lots of ways.  It's all different, so --
12  Q     Do you have kind of a target audience of
13  folks who aren't able to get financing with a
14  normal bank?
15  A     No.                                            3:59PM
16  Q     Okay.
17  A     I don't target anybody.
18  Q     Do you check credit for any of the folks
19  that you enter into contracts for deed for?
20  A     I do.                                          3:59PM
21  Q     You do pull credit?
22  A     I check credit.
23  Q     Okay.  And how do you do that?
24  A     Through Experian, through credit checks,
25  LexisNexis.                                          3:59PM
```

```
 1  Q     Do you provide the folks you pull credit on      3:59PM
 2  with notice that you pulled their credit and a
 3  copy of their credit report?
 4  A     I don't.
 5  Q     Okay.                                             4:00PM
 6  A     No.
 7  Q     You don't know or no?
 8  A     I've never been asked to.
 9  Q     Have you been trying to obtain refinancing
10  on all of your notes with First Bank & Trust?         4:00PM
11  A     I did, yes.
12  Q     And have you been successful in obtaining
13  that refinancing?
14  A     Yes.
15  Q     But you've not received any funds to pay         4:00PM
16  off these loans yet; correct?
17  A     We're waiting to pay them off, yes.
18  Q     Okay.  And have you seen the response?
19        THE COURT:  I apologize.  I didn't hear
20  that last response.  Would you say it again?          4:00PM
21  A     Me, Your Honor?
22        THE COURT:  Yes.  Would you please
23  repeat your answer.  I was --
24  A     I was waiting to close on them.
25  Q     (By Ms. George)  And are you aware that this     4:00PM
```

61

 1  hearing has been set a number of times since we          4:00PM
 2  filed it as an emergency in July?
 3  A     Yeah.
 4  Q     Okay.  And it's your understanding that the
 5  times -- the two or three times we've continued         4:01PM
 6  before today it was because financing was about
 7  to be funded?
 8  A     I don't understand your question.
 9  Q     Do you understand the basis of those
10  continuances were promises of refinancing, that's       4:01PM
11  why we didn't go forward with this hearing
12  before?  Did your attorney communicate that to
13  you, without giving any attorney-client privilege
14  information?
15         MR. RAYMENT:  I think the question calls          4:01PM
16  for that.
17         MS. GEORGE:  Well, I'm just asking if he
18  knew the reason for this continuance -- the
19  continuances of these hearings?
20         THE COURT:  In a limited capacity he can          4:01PM
21  give a answer, yes or no, did he know.  But we're
22  not going to invade any attorney-client
23  communications.
24  A     So can you repeat your question?
25  Q     (By Ms. George)  Do you have an                    4:01PM

62

1  understanding of the reason we haven't had this          4:01PM
2  hearing before is because we had been told
3  financing was going to occur?
4  A      No.  I don't understand your question.
5  Q      Have you been trying to get financing since       4:02PM
6  May?
7  A      I did get financing, yes, so --
8  Q      When -- okay.  Let me ask it differently.
9  Have you received proceeds from a loan sufficient
10 to pay off my client's loan since May -- anytime         4:02PM
11 from May to now?
12 A      Yeah, we tried several times, and you
13 wouldn't accept the money.
14 Q      There's been a closing where a loan has
15 been entered into and you've been funded?                4:02PM
16 A      You wouldn't allow the closing to go
17 through.
18 Q      What did my client do to not allow a
19 closing to go through?
20 A      Wouldn't accept the money that they wanted         4:02PM
21 to pay you.  You wouldn't release the property.
22 Q      Okay.  Do you have an understanding about
23 the reason that we -- the bank wouldn't release
24 the property until there's full proceeds of notes
25 because of cross-collateralization clauses?             4:02PM

63

```
 1  A     No, I do not understand that.                    4:02PM
 2  Q     If -- did you see your attorney's objection
 3  to the motion to appoint receiver filed in this
 4  case?
 5  A     I didn't see it, but talked about it.            4:03PM
 6  Q     Are you familiar that in paragraph 14 it
 7  states that it is expected to take until
 8  mid-August to close on the loan given the number
 9  of properties involved in the filing of this
10  action?  Do you have any reason to disagree with    4:03PM
11  me if I represent that's what's the document says
12  filed on your behalf of your attorey -- or by
13  your attorney on your behalf?
14  A     Yeah.
15  Q     And it did not in fact close in August;         4:03PM
16  correct?
17  A     Correct.
18  Q     And as we sit here today that financing
19  still has not closed; correct?
20  A     Correct.                                         4:03PM
21  Q     And are you aware that my office has
22  provided payoff quotes to Certain Lending at
23  least five times since May?
24  A     No, I'm not.
25  Q     Are you aware that we received a letter          4:03PM
```

1  from Certain Lending last evening regarding the          4:03PM
2  amount to be funded by Certain Lending?  Have you
3  received a copy of that letter?
4  A     They told me how much they were going to
5  fund, yes.                                                4:04PM
6          MS. GEORGE:  Okay.  Your Honor, I hand
7  you what we've marked as Exhibit 18.
8  Q   (By Ms. George)  Is this what you're talking
9  about?
10 A     Yes.                                                4:04PM
11 Q     What is the amount that that letter states
12 that Certain Lending would be funding?
13 A     $4,844,244.
14 Q     And is Certain Lending the only lender that
15 my office has communicated with, to your              4:04PM
16 knowledge, with respect to your loans?
17 A     Yes.
18         MS. GEORGE:  Okay.  And, Your Honor, we
19 would move to admit Exhibit 18.
20         MR. RAYMENT:  No objection, Your Honor.      4:05PM
21         THE COURT:  Exhibit 18 will be admitted.
22         MS. GEORGE:  Your Honor, I'd hand you
23 Exhibit 19.
24 Q   (By Ms. George)  At your attorney's request,
25 we provided this payoff last Thursday to be able      4:05PM

1  to provide to Certain Lending.  Have you seen          4:05PM
2  that before?  Are you aware of the payoff?
3  A     Yeah.
4  Q     If you could, at the very bottom, state the
5  full amount of the payoff that was quoted as of        4:05PM
6  November 7th?
7  A     $5,418,959.
8  Q     And so the amount in the Certain Lending
9  document that we received last night is
10 insufficient to pay the loans in full, is it not?      4:05PM
11 A     For them, yes.
12 Q     And it was my understanding that you were
13 going to bring the difference in cash to the
14 closing; is that accurate?
15 A     That and some other payoffs and another          4:06PM
16 loan, yeah.
17 Q     And do you -- it's my understanding from
18 that letter that this financing was -- is set to
19 close November 14th or 16th, is that correct,
20 from the Certain Lending exhibit?                       4:06PM
21 A     Yes.
22 Q     Okay.  And do you have the other funds
23 sufficient to make up the difference in lending
24 or in a bank account like ready to go, like you
25 could write the check?                                  4:06PM

66

```
 1  A     Yes.                                              4:06PM
 2          MS. GEORGE:  Your Honor, we'll mark --
 3  did I move to admit 19, Your Honor?  I would move
 4  to admit the payoff quote that was provided.
 5          THE COURT:  Any response, Mr. Rayment?         4:07PM
 6          MR. RAYMENT:  No objection, Your Honor.
 7          THE COURT:  Exhibit 19 will be admitted.
 8          MS. GEORGE:  Your counsel before the
 9  hearing gave an ASAP Approval that we'd mark as
10  Exhibit 20.  And we would move to admit that as     4:07PM
11  well, Your Honor.
12          MR. RAYMENT:  No objection, Your Honor.
13          THE COURT:  Exhibit 20 will be admitted.
14  Q   (By Ms. George)  What is the date of this
15  approval?                                            4:07PM
16  A     November 11th.
17  Q     Okay.  And if you would, this approval is
18  subject to receipt and satisfaction of the
19  following conditions:  Maintain current credit,
20  income, employment and assets standards; receipt    4:07PM
21  of satisfactory appraisal, title and hazard owner
22  insurance; three months of bank statements on all
23  accounts; and, four, approval is subject to
24  changes in investor underwriting policies and
25  lending guidelines.  This note -- this approval      4:07PM
```

```
 1  hasn't even gone through underwriting yet, has          4:07PM
 2  it?
 3  A     No.
 4  Q     So if you were to close on the 14th through
 5  16th, you don't have this additional 1.6 million        4:08PM
 6  that would be funded at that same time, do you?
 7  A     Repeat your question.
 8  Q     Hypothetically, if your Certain Lending
 9  loan closes on the 14th through 16th, as is
10  proposed in the Certain Lending letter, you do          4:08PM
11  not have sufficient funds readily available to
12  fund the difference between that loan and the
13  full balance owed to my client; correct?
14  A     No, I do.
15  Q     You do?  Where?  By virtue of that --            4:08PM
16  A     Cash.
17  Q     You have 1.6 million in cash to bring to
18  the closing?
19  A     I don't need 1.6 million.
20  Q     You do --                                         4:08PM
21        MR. RAYMENT:  Objection.
22  Q  (By Ms. George)  Do you have the difference?
23        THE COURT:  Hang on just a moment,
24  Miss George.  First of all, Mr. Nguyen, just only
25  answer the questions and so don't ask -- don't          4:08PM
```

68

```
 1  answer a question right now.                        4:08PM
 2          Mr. Rayment, you have an objection.
 3          MR. RAYMENT:  My objection is Counsel's
 4  statement about having a million six to bring to
 5  closing.  He doesn't need a million six to make     4:09PM
 6  up the difference.
 7          MS. GEORGE:  I can clean that up.
 8          THE COURT:  Okay.  Well, that's not
 9  really an objection, but just go ahead and fix
10  that, Miss George.                                  4:09PM
11  Q   (By Ms. George)  Looking at the Certain
12  Lending letter --
13  A     Uh-huh.
14  Q     -- there is a shortfall compared to the
15  payoff that was provided as of Friday?              4:09PM
16  A     Correct.
17  Q     Do you have sufficient cash readily
18  available to make up that shortfall if closings
19  were to happen later this week?
20  A     I do.                                         4:09PM
21  Q     And do you have proof of that cash?
22  A     Yes.
23  Q     Your counsel provided me with a bank
24  statement that I'm happy to go ahead and put into
25  the record as well.  We'll mark this as             4:09PM
```

1  Exhibit 21.  We'll mark this as Exhibit 21.                    4:09PM
2       What is the ending balance reflected in
3  that bank statement?
4  A    It was 26,000.
5  Q    That's not sufficient to make up the          4:10PM
6  difference between the amount in the -- the
7  Certain Lending letter and the balance owed to my
8  client, is it?
9  A    No.
10 Q    Okay.  Do you have other proof of cash         4:10PM
11 available with you here today to show that
12 difference?
13 A    Yeah.  I have my bank statement on my
14 phone.
15 Q    But the bank statement you provided to your    4:10PM
16 counsel shows a bank account with $26,000 in it.
17 A    Yeah.  This was dated -- that was as of
18 November the 1st.
19 Q    Okay.  I'll let your counsel inquire about
20 that.                                               4:10PM
21 A    Okay.
22 Q    On these contracts for deed -- and I
23 apologize if I asked this before -- you do not
24 record those contracts for deed in the land
25 records, do you?                                    4:11PM

```
 1  A     No.                                                4:11PM
 2  Q     And why don't you record those contracts
 3  for deed?
 4  A     Never been asked to.  Never --
 5  Q     I'm sorry?                                         4:11PM
 6  A     I've never been asked to, never been --
 7  never had a problem.
 8  Q     Did you sell the apartment complexes that
 9  my client has a mortgage on with respect to Loan
10  No. 1589 to Hot Coffee Homes in November of 2024?  4:11PM
11  A     I did.
12  Q     Did you obtain permission from my client to
13  do so?
14  A     I did.
15  Q     And do you have that in writing?                   4:11PM
16  A     Sure.  I do somewhere.
17  Q     And can you provide that today?
18  A     No.
19  Q     And did you pay the proceeds from that sale
20  to pay off that loan when you sold it?                   4:11PM
21  A     The banker didn't require -- I don't know.
22  He didn't require me to.
23        MS. GEORGE:  Your Honor, to save time,
24  I'm not going to walk you through the mortgage.
25  I'll let you read what that would say with              4:12PM
```

1  respect to application of proceeds from sale of          4:12PM
2  collateral.
3          With that, I don't believe that I have
4  any further questions.  Actually, just one.
5  Q    (By Ms. George)  Did you tell Hot Coffee      4:12PM
6  Homes that First Bank & Trust had an mortgage on
7  the apartments when you sold it to them?
8  A    I did.
9  Q    And what is your financing arrangement with
10 Hot Coffee Homes?                                   4:12PM
11 A    I financed 80 percent of it -- the loan, I
12 guess, for it.
13 Q    It's self-financed, and they're continuing
14 to make payments to you?
15 A    They are.                                      4:12PM
16 Q    And you're not remitting those payments to
17 the bank at this time; correct?
18 A    I tried to.
19 Q    But you aren't right now?
20 A    You wouldn't take my payment.                  4:12PM
21        MS. GEORGE:  Okay.  With that, I have
22 nothing further.
23        THE COURT:  The only question I have is
24 what section do I --
25        MS. GEORGE:  Certainly.                      4:13PM

72

```
 1            THE COURT:  -- look to for the           4:13PM
 2   application of proceeds.
 3            MS. GEORGE:  On page four, Your Honor,
 4   it's about midway down -- oh, that's about
 5   damage.  Sorry.                                    4:13PM
 6            THE COURT:  So, no, not on page four?
 7   Yes, on page four.
 8            MS. GEORGE:  I think that's talking
 9   about insurance proceeds though.
10            THE COURT:  Okay.                          4:13PM
11            MS. GEORGE:  Well, I would point out a
12   number of things in the mortgage, Your Honor.  On
13   page two, grantor agrees that grantor's
14   possession and use of the property --
15            THE COURT:  Are we talking about in the    4:13PM
16   assignment of rents section?
17            MS. GEORGE:  No, farther down, the
18   possession of and maintenance of the property.
19            THE COURT:  Okay.  I see.
20            MS. GEORGE:  Let me see what else I        4:14PM
21   could point out to you.  Sorry, my effort to be
22   faster for you is -- page four, payment, talks
23   about grantor shall maintain the property free of
24   any liens having priority over or equal to
25   lender, except as agreed for in writing.  And      4:14PM
```

1 there's a mortgage with respect to this.  That's                    4:14PM
2 insurance.  Warranty and defense of title, the
3 grantor holds good and marketable title of record
4 to the property free and clear of land -- he's
5 transferred it.  He's issued a general warranty          4:14PM
6 deed to Hot Coffee Homes.  There's a number of
7 provisions we could walk through with how that
8 sale violates the mortgage.
9           THE COURT:  Okay.
10           MS. GEORGE:  Let me see if there's --           4:15PM
11 but, yes, we just ask the Court to take notice of
12 the mortgage.  And with that, I don't have any
13 further questions.
14           THE COURT:  Okay.  Cross-examination?
15           MR. RAYMENT:  Yes, Your Honor.                  4:15PM
16           MR. RUSHER:  Your Honor, I have a few
17 questions.  Do I ask him or follow yours?
18           THE COURT:  I'm sorry.
19           MR. RUSHER:  I have a few questions, my
20 apartment complex; so I didn't know if you wanted         4:15PM
21 him to go first or me to go first.
22           THE COURT:  We'll let -- why don't you
23 go first, Mr. Rusher.  Then Mr. Rayment can clear
24 up anything in his cross-examination.
25           MR. RUSHER:  May I approach, Your Honor?        4:16PM

74

```
 1            THE COURT:  You may.                        4:16PM
 2                  CROSS-EXAMINATION
 3  BY MR. RUSHER:
 4  Q     Mr. Nguyen, my name is Jim Rusher.  I'm the
 5  attorney for Hot Coffee Homes.  You testified          4:16PM
 6  earlier that you had sold an apartment complex to
 7  my client; correct?
 8  A     Correct.
 9  Q     And I've handed you -- that's the general
10  warranty deed you gave to my client at the time        4:16PM
11  it was sold; correct?
12  A     I didn't prepare this, no.
13  Q     I did not ask if you prepared it.
14        Is that a deed that you signed, pursuant to
15  which you transferred the property to my client?       4:16PM
16  A     I don't see my signature on there.
17  Q     If you look at the second page.
18  A     Oh, yeah.  Yeah.  Yeah, there it is.  That
19  is.
20  Q     And that's the deed that you signed;             4:17PM
21  correct?
22  A     That's the deed that was provided at the
23  title office, yes.
24  Q     And you signed it; correct?
25  A     Yes.                                             4:17PM
```

75

1   Q      And that's -- and you admit you transferred      4:17PM
2   property to my client, Hot Coffee Homes; correct?
3   A      Yes.
4   Q      And that's an apartment -- we've talked a
5   lot about houses today, but this is actually an       4:17PM
6   apartment complex; correct?
7   A      Yes.
8   Q      And since that property was sold in
9   November of 2024 has Hot Coffee Homes been solely
10  responsible for managing that apartment complex?      4:17PM
11  A      Yes.
12  Q      And they have been making the payments
13  required that you testified to -- they've been
14  regularly making those payments?
15  A      They have.                                      4:17PM
16  Q      And that deed is a general warranty deed;
17  correct?
18  A      Looks like it, yes.
19          MR. RUSHER:  Okay.  I have no further
20  questions, Your Honor.  We would move for            4:17PM
21  admission -- I don't know what exhibit -- if you
22  want to --
23          THE COURT:  We are on No. 19, I think.
24  No, sorry, 22.  Excuse me.  Exhibit 22.
25          MR. RUSHER:  We'd move for admission of      4:18PM

1 Exhibit 22, Your Honor.                                    4:18PM

2          MR. RAYMENT:  No objection.

3          THE COURT:  And, Miss George, I assume

4 no objection.

5          MS. GEORGE:  No objection, Your Honor.        4:18PM

6          THE COURT:  Exhibit 22 will be admitted.

7          MS. GEORGE:  We'll need to make sure

8 that copy gets to the Court because it has the

9 exhibit number on it.

10          THE COURT:  Are you going to be asking    4:18PM

11 questions about Exhibit No. 22?

12          MR. RAYMENT:  Probably not, Your Honor,

13 if you wish to see it.

14          THE COURT:  Well, I just need to make

15 sure we keep it all together.  Thank you.         4:18PM

16          MR. RAYMENT:  May I proceed, Your Honor?

17          THE COURT:  Yes.

18                **CROSS-EXAMINATION**

19 BY MR. RAYMENT:

20 Q    Mr. Nguyen, when did your business with the     4:18PM

21 Plaintiff first begin?

22 A    Around 2019 or so.

23 Q    And have you had the same bank officer,

24 loan officer, administering your loans since that

25 time?                                                4:19PM

1  A      Yes.                                                    4:19PM

2  Q      Who was that loan officer?

3  A      James Davis.

4  Q      Counsel asked you a question about whether

5  you had kept the bank informed of your address      4:19PM

6  for notice purposes.  Do you recall that

7  question?

8  A      Yes.

9  Q      Did you keep the bank advised as to your

10 address?                                                       4:19PM

11 A      Yes.

12 Q      Did you tell Mr. James?

13 A      Yes, James.  He did -- he did my accounts.

14 He did everything for them; so he knew

15 everything, and he was always supposed to be    4:19PM

16 taking care of everything.

17 Q      Was there ever an issue with you receiving

18 statements from the bank?

19 A      I've never received any.

20 Q      Did you ever bring that up to Mr. Davis?    4:20PM

21 A      I brought it up to -- I believe her name is

22 Summer that works at the bank, but I don't think

23 I spoke to James about it.

24 Q      Okay.  And did Summer give you responses to

25 why you weren't getting notices?                       4:20PM

78

```
 1  A     She said that they had been going to the          4:20PM
 2  wrong address or a return address or something,
 3  so --
 4  Q     Did she say whether or not they'd been
 5  returned to the bank?                                    4:20PM
 6  A     Yeah, she said she got them.
 7  Q     For how long a period of time were notices
 8  going to the wrong address and being returned to
 9  the bank before you had this conversation with
10  her?                                                     4:20PM
11  A     Can you repeat your question?  I don't --
12  Q     Yeah.
13        Do you recall the conversation you had with
14  her about the statements?
15  A     Correct.                                           4:21PM
16        THE COURT:  I'm sorry, are we talking
17  bank statements or are we talking about loan
18  payments?
19        MR. RAYMENT:  Both, Your Honor.
20        THE COURT:  Okay.                                  4:21PM
21        MR. RAYMENT:  And I'll clarify that.
22        THE COURT:  All right.  Thank you.
23  Q   (By Mr. Rayment)  Did you ever receive any
24  loan statements from the bank?
25  A     I did not.                                         4:21PM
```

79

1  Q    And you never received any bank statements    4:21PM
2  from the bank?
3  A    I have not.
4  Q    Okay.  Over how long a period of time had
5  that occurred?                                      4:21PM
6  A    Five years.
7  Q    How would you know what to pay to the bank?
8  A    James would tell me.
9  Q    Tell the Court how that would transpire.
10 A    Just every month he would -- he would tell    4:21PM
11 me how much to put in the bank, and then he would
12 make the payments for me.
13 Q    Did there ever come a time when you
14 challenged the bank's statements?
15 A    Yeah, I believe it was in the end of 2024     4:22PM
16 when I got a new loan from them, then I saw the
17 statement, and it was severely wrong.
18 Q    Okay.  What did you do about that?
19 A    I asked James about it, and he couldn't
20 give me an answer on why.  And he just said he       4:22PM
21 would look into it, and that's where we are at.
22 Q    Can you tell the Court what it was about
23 the information you were receiving that caused
24 you to believe it was wrong?
25 A    Yeah.  I had made -- it was on a new loan.    4:22PM

80

1   These loans that we're talking about, these loans          4:22PM
2   are about five years old.  And then James had
3   came to me after about three years of not doing
4   any new loans, he told me that he could do some
5   new loans for me and so I got a loan.  I think it        4:23PM
6   was like a $900,000 loan, and it was just, you
7   know, business as normal.  He told me how much to
8   put in there.  I put it in there and -- but then
9   I don't -- I forgot what I did with that.  I saw
10  the account in -- I had made like five payments          4:23PM
11  of -- I think they were around 8,000-something a
12  payment and there was $17 taken off the
13  principal.  And so I had asked James about it,
14  and he said -- first he gave me some excuse on,
15  oh, that's normal on a commercial loan.  And he          4:24PM
16  says, you don't -- you know, principal doesn't
17  come off until four, five months later.  And I
18  told him, no, that's not true.
19       And then so I -- at that point I told him I
20  wasn't going to make any payments on that loan           4:24PM
21  anymore, and I was moving out of the bank because
22  my money wasn't getting applied correctly.  And
23  so I went to get it refinanced, and I got it
24  refinanced.  Refinancing took a little longer
25  than expected; so I guess the loan was maybe 60          4:24PM

1  days due by the time I was able to refinance it.                    4:24PM
2  And then -- but it was paid off, and it was moved
3  away from the bank.  And that's what -- me being
4  late on that loan is what -- the bank was
5  calling -- using for cross-collateralization to            4:25PM
6  call the notes on the whole portfolio.
7  Q    Were you current on the other loans at that
8  time?
9  A    I was.  I had never been late.
10 Q    How long after you challenged the bank's             4:25PM
11 accounting did they file this lawsuit?
12 A    I don't -- they filed -- I didn't even know
13 they filed.  Like I said, I was -- I found out --
14 I don't remember the exact month, but I believe
15 it was -- once I found out, I immediately went to       4:25PM
16 go refinance the properties because -- and then
17 when I -- and that took 60 days, I think, or --
18 and so once I got refinanced -- well, I had more
19 problems because when I went to go pay it off I
20 think payoff was 927,000.  So by this time I had         4:26PM
21 paid like 70-some thousand dollars with virtually
22 no money coming off the principal.  And so I had,
23 you know -- so something was really wrong.  And
24 so then I had asked the bank, I think, for an
25 accounting -- forensic, you know, accounting of          4:26PM

1  all my accounts.  And then that's when I                     4:26PM
2  discovered myself that my accounts had been
3  totally mishandled and just -- they are
4  completely wrong, so --
5  Q      Did you ask the bank for an accounting?          4:26PM
6  A      Yes, I did.
7  Q      Did you get one?
8  A      I did not.
9  Q      Has the bank to this day provided you with
10 an accounting other than the exhibits they've put     4:27PM
11 in front of you today?
12 A      No, they have not.
13 Q      What happened to the banker that you were
14 dealing with?
15 A      I believe he was let go.  I had called --    4:27PM
16 he had -- I didn't hear from him for about a
17 month and so I got concerned.  And I called
18 there, tried to get ahold of him, but he was no
19 longer there.  And then that's when I tried to
20 make my payment.  And I had never made a payment     4:27PM
21 for five years without doing it the way that he
22 had me do it, and so I asked -- I asked them how
23 I could pay.  And they wouldn't -- they wouldn't
24 take my payment.  They said you got to pay it all
25 or nothing.  You have to pay it all -- yeah, or      4:28PM

83

1  nothing.                                                     4:28PM

2       So I didn't know what to do; so I just went

3  ahead and just deposited $40,000, which was

4  what -- around that was what my payments would

5  be.  And so I put it in the bank like I always   4:28PM

6  do, like mobile deposit.  And they took the money

7  out, and so I thought they took it for -- to make

8  my payment.  But then the following month they --

9  I think they -- I had called and -- to make my

10 payment again, and they said that they wouldn't    4:28PM

11 take my payment.  They told me I was in default

12 and -- but then I told them I couldn't -- I

13 wouldn't deposit the money like I would normally

14 because I had no idea where the money went, the

15 $40,000 that I had put in there.  There was no     4:29PM

16 explanation on where it went or where it got

17 applied or anything so --

18 Q    Have you sought financing to pay off the

19 bank?

20 A    Yes.                                           4:29PM

21 Q    Counsel handed you a document from Certain

22 Lending.

23 A    Uh-huh.

24 Q    Has Certain Lending agreed to lend you

25 money in relation to some of the properties        4:29PM

1 pledged to the bank?                                    4:29PM

2 A     Yes.

3 Q     And how many of the properties -- well, let

4 me start this way.  How many properties are

5 pledged to the bank?                                    4:30PM

6 A     I believe it's around 52.

7 Q     How many of those 52 properties is Certain

8 Lending proposing to close on in the next week?

9 A     I believe it's 38 of them.

10 Q     And how much are they prepared to pay to     4:30PM

11 close on those 38?

12 A     They were -- I believe it was 5.3 million.

13 Q     And then Counsel had asked you questions

14 about what the bank's owed more.

15 A     Uh-huh.                                         4:30PM

16 Q     Is the bank adding default interest into

17 its balance?

18 A     I believe so.

19 Q     At what, 15 percent?

20 A     Something.                                      4:30PM

21 Q     Is the bank adding attorney's fees into

22 their payoff?

23 A     I believe so.

24 Q     Have you seen any accounting as to how much

25 attorney's fees they're asking you to pay?           4:30PM

```
 1  A      I have not.                                          4:30PM

 2  Q      They're just demanding you pay this

 3  5 million plus; correct?

 4  A      Correct.

 5  Q      Now you heard one witness from the stand    4:31PM

 6  say that an appraiser was sent out to her

 7  property?

 8  A      Correct.

 9  Q      Do you know anything about that?

10  A      I do.                                       4:31PM

11  Q      What was that about?

12  A      I -- the bank was basically not letting me

13  pay on my loans anymore; so I was forced to go

14  move them out of the bank.  And so in order to do

15  so, I needed to have all the properties           4:31PM

16  appraised.  And so that's what we did, we went

17  out and got them appraised.  But they refused to

18  let the appraiser in, and so that was just one

19  property that we couldn't get money on, so --

20  Q      Was the lender, Certain Lending, able to    4:32PM

21  get appraisals on the other properties?

22  A      Yes, I mean, for the most part.  Not all of

23  them, but yes.

24  Q      And if Certain Lending pays this

25  5.2 million in the next week, how many properties  4:32PM
```

1    will the bank still have as collateral?                4:32PM
2    A    It looks like 14.
3    Q    Do you know what the value of those 14 are?
4    A    Yes.  It's 2 and a half million.
5    Q    So even if they got paid 100,000 shy of        4:32PM
6    their balance, they'd still have 2 and a half
7    million collateral left; is that correct?
8    A    Yes.
9    Q    And does that count the other properties
10   that Nguyen Win Properties owns?                      4:33PM
11   A    No.
12   Q    Does Nguyen Win own additional properties
13   to those pledged to the Plaintiff in this case?
14   A    It does.
15        MR. RAYMENT:  Your Honor, I had this            4:33PM
16   premarked as Defendant's Exhibit 3.  Is it okay
17   if I use that?
18        THE COURT:  Sure.
19   Q    (By Mr. Rayment)  Mr. Nguyen, I've handed
20   you what I've marked as Defendant's Exhibit 3.       4:33PM
21   Do you recognize this document?
22   A    I do.
23   Q    What is it?
24   A    Just the rent roll or the properties that
25   Nguyen Win property owns.                             4:33PM

```
 1  Q     And did you prepare this?                        4:34PM
 2  A     I had input in it, yes.
 3  Q     And where did you come up with the values
 4  that are on this document?
 5  A     It was just a mixture between a couple          4:34PM
 6  internet tools, Broad Street and Zillow and
 7  Realtor.com and the assessor's office.
 8  Q     Are those sources typically relied upon in
 9  your industry to establish values for properties?
10  A     Yes.                                             4:34PM
11  Q     What does this document show as the market
12  value of all the properties that Nguyen Win
13  Properties owns that are not pledged to First
14  Bank?
15  A     $19,597,999.                                     4:34PM
16  Q     And there are loans against those
17  properties as well?
18  A     There is.
19  Q     And what is the loan balance on all those
20  properties?                                            4:35PM
21  A     Looks like $10,271,797.
22  Q     So you have roughly $9 million of equity on
23  these other properties?
24  A     Yep.
25        MR. RAYMENT:  Your Honor, I move for            4:35PM
```

1  admission of Exhibit 3.                                    4:35PM

2         MS. GEORGE:  Your Honor, I would object

3  on a number of grounds.  This is a document

4  prepared by Mr. Nguyen.  It doesn't have the data

5  showing where he got the Zillow amounts for the      4:35PM

6  market value.  It doesn't have the transaction

7  histories to show the loan balance.  I think he

8  can testify to these, but I don't think that this

9  can be used to establish the property values or

10 the loan balances without the underlying            4:35PM

11 documentation establishing those, other than his

12 unilateral testimony.  So for that reason we

13 object.

14        MR. RAYMENT:  Your Honor, owners are

15 allowed to testify to the value of their            4:35PM

16 property.

17        THE COURT:  Well, sometimes they are and

18 sometimes they are not.

19        MS. GEORGE:  It would be different if he

20 brought the Zillow and the different sources that   4:36PM

21 he's saying he relied upon to determine that

22 value.  And he stated he relied upon those, but

23 hasn't provided those to the Court; so for that

24 reason I don't think we can rely upon the values

25 without the underlying evidence.                    4:36PM

1          THE COURT:  It needs the foundation          4:36PM
2  to -- for him to testify as to the value of his
3  property.
4          MR. RAYMENT:  Well, I'll ask a few more
5  questions on that, Your Honor.                         4:36PM
6          THE COURT:  All right.
7  Q    (By Mr. Rayment)  Mr. Nguyen, what did you
8  do to determine the value of these properties?
9  A    Like I said, it's a mix between --
10 Q    I'm sorry, can you speak up a little bit.        4:36PM
11 A    Yeah.  It's a -- it's an average of like
12 Zillow and Broad Street and Realtor.com, and so
13 we -- we just researched it and -- I don't know
14 how --
15 Q    Were any of the properties on this list not   4:36PM
16 properties that you could find values for on
17 these sources that you previously identified?
18 A    No.  You can find the value of them on
19 these -- those sources.
20 Q    And did you enhance the value of these        4:37PM
21 properties at all when you made this document?
22 A    No.
23         MR. RAYMENT:  Your Honor, I again move
24 for admission.
25         MS. GEORGE:  Same objection, Your Honor.    4:37PM

1          THE COURT:  Okay.  So I'm not -- I'm not          4:37PM
2   here to tell everybody how to do their part here,
3   but generally speaking, when you're going to
4   testify as to the value of property, whether it
5   be your own or as an expert for someone else's,          4:37PM
6   you've got to establish that you are familiar and
7   you have been to and reviewed and made an
8   independent appraisal of the value of the
9   property or that you have some way to establish
10  the value of the property, other than looking          4:38PM
11  things up on the internet.
12          MR. RAYMENT:  Your Honor, I'm happy to
13  ask him some more questions to clear that up.
14          THE COURT:  Okay.
15  Q    (By Mr. Rayment)  Mr. Nguyen, how many homes          4:38PM
16  have you purchased in your career?
17  A    Over 200.
18  Q    And have you been the person who has
19  determined the value of those properties when
20  you've purchased them and sold them?          4:38PM
21  A    I have.
22  Q    Do you feel you have sufficient experience
23  to determine the market value of a piece of
24  property?
25  A    I do.          4:38PM

```
1  Q    And has your valuation of these properties      4:38PM
2  proven to be accurate when you ultimately decide
3  to sell?
4  A    Yes.
5        MR. RAYMENT:  Your Honor, I renew my           4:38PM
6  motion.
7        THE COURT:  Okay.  I'm going to sustain
8  the objection of Miss George.  Exhibit No. 3 will
9  not be admitted.
10 Q   (By Mr. Rayment)  Mr. Nguyen --                   4:39PM
11 A    Yes.
12 Q    -- did Certain Lending go out and value the
13 properties that they're looking at refinancing?
14 A    They did.
15 Q    And what value did they come back with on        4:39PM
16 these properties?
17        MS. GEORGE:  Objection, Your Honor.
18 Hearsay.
19        THE COURT:  Exception, Mr. Rayment?
20        MR. RAYMENT:  Your Honor, this relates a       4:40PM
21 the document that the Plaintiff admitted into
22 evidence, showing what properties that Certain
23 Lending was prepared to refinance.
24        THE COURT:  Okay.  Refresh my memory on
25 that document number or the exhibit number.          4:40PM
```

1           MS. GEORGE:  Your Honor, that's the          4:40PM
2    Certain Lending letter.  I apologize, I don't
3    have --

4           THE COURT:  I have it here.

5           MS. GEORGE:  And it doesn't reference          4:40PM
6    what properties nor does it establish any values.

7           THE COURT:  Well, I have it here.
8    No. 18.  Exhibit 18.

9           Okay.  And -- okay.  So the objection is
10   hearsay.  And what -- under what exception -- or    4:40PM
11   what response do you have that it's either not
12   hearsay or it's --

13          MR. RAYMENT:  It's a document prepared
14   in the ordinary course of business by the lender
15   who has been in discussions with the Plaintiff to   4:41PM
16   buy out this loan.

17          THE COURT:  This document, No. 18, yes.
18   Well, that's already admitted.  And what you are
19   asking is about values of the properties that
20   Certain Lending was willing to loan on.  So I       4:41PM
21   haven't seen a document prepared in the ordinary
22   course of business there.

23          MR. RAYMENT:  Your Honor, they admitted
24   the document that had the loan number in it that
25   Certain Lending was prepared to advance.            4:41PM

93

 1          THE COURT:  Okay.  So I do see in the                    4:41PM
 2 Exhibit No. 18 that they are -- they said that
 3 they will loan $4,844,244.  I do see that.  I
 4 don't see anything in here, however, that says
 5 anything about the value of what they assessed on         4:42PM
 6 the properties.  This doesn't even reference how
 7 many properties.
 8          MR. RAYMENT:  Well, I'll get to that,
 9 Your Honor.
10          THE COURT:  So I'm -- if you have a               4:42PM
11 document that applies here, I'm happy to take a
12 look at it.
13          MR. RAYMENT:  Give me just one minute
14 here, Your Honor.  Well, I had it here.  May I
15 approach, Your Honor?                                      4:43PM
16          THE COURT:  You may.
17 Q   (By Mr. Rayment)  Mr. Nguyen, I handed you
18 Defendant's Exhibit 2.  What is that document?
19 A    Looks like an e-mail to First Bank & Trust
20 on the properties that they are going to                   4:43PM
21 refinance or giving money on to pay them off.
22 Q    Does this document show how much Certain
23 Lending is prepared to pay at closing?
24 A    Yes.
25 Q    How much is that?                                     4:44PM

94

```
 1  A      Says $5,218,300.                              4:44PM
 2  Q      And do you recall what the issue was
 3  between getting the bank paid off and Certain
 4  Lending's financing at the point in time that
 5  this document was prepared?                          4:44PM
 6  A      I do.
 7  Q      Tell the Court about that.
 8  A      They wouldn't allow them to -- well, they
 9  wanted to do the same thing they did to me,
10  just -- they wanted all of the payoff all at once    4:44PM
11  and wouldn't do partial releases.
12  Q      When you say they, who are you referring
13  to?
14  A      First Bank & Trust.
15  Q      And what was Certain Lending trying to do?    4:45PM
16  A      Oh, they wanted to close them up like --
17  like ten properties at a time to make it a little
18  easier, but then First Bank & Trust wanted to --
19  wanted them to close all like 38 or --
20  Q      Why is it easier for a new lender to handle   4:45PM
21  ten properties at a time instead of handling all
22  52?
23  A      Because of the amount of money, first of
24  all, I mean.  And then you have balance and you
25  got to pay off the -- just logistics of it all       4:45PM
```

```
 1   is --                                                      4:45PM
 2          THE COURT:  When you say new lender,
 3   what do you mean?  Like this is a new -- like
 4   Certain Lending is new, like they haven't lended
 5   before or it's just new for him?                           4:46PM
 6          MR. RAYMENT:  I don't know, Your Honor,
 7   the answer to that.  All I was trying to do is
 8   what Certain Lending had to do to be able to
 9   loan.
10          THE COURT:  I'm sorry, you said new        4:46PM
11   lender.
12          MR. RAYMENT:  Oh, they were the new
13   lender.  They're taking out the bank.  That's
14   what I meant by new lender.
15          THE COURT:  Okay.  Thank you.              4:46PM
16   Q    (By Mr. Rayment)  Did Certain Lending have
17   to do appraisals on the properties?
18   A    Yes.  Well, they -- I had to.  They
19   required to have them -- the ones that they were
20   going to loan money on get appraised.            4:46PM
21   Q    And did they have to clear title?
22   A    Yes.
23   Q    So did abstracts have to be prepared on
24   each and every one of these properties?
25   A    They did.                                    4:46PM
```

1  Q     Did that take time?                                    4:46PM

2  A     Of course, yes.

3  Q     Did it have to go through underwriting

4  after those things were accomplished?

5  A     It had to go through all the processes,                4:47PM

6  yeah.

7  Q     So if Certain Lending was prepared to close

8  on part of the properties and pay the bank down

9  and then close on more and pay the bank further,

10 would that have put the bank in jeopardy?                    4:47PM

11 A     Not at all.

12 Q     Why?

13 A     Because that's what they tried to do, and

14 they wouldn't accept anything but full payment.

15 And they even offered to over-collateralize it,             4:47PM

16 each payment of 150 percent even just so they

17 could secure the bank's position, but they

18 wouldn't -- they didn't want to do it.  They

19 didn't want to work with them so --

20 Q     Had Certain Lending been permitted to close            4:47PM

21 on some of the loans --

22 A     Yeah.

23 Q     -- what loan to value were they using on

24 these properties?

25 A     On the average was 57 percent loan to                  4:48PM

1  value.                                                          4:48PM
2  Q      And if Certain Lending was using 57 percent
3  of loan to value and they were closing on 38 of
4  the properties and able to come up with 4 --
5  between 4.8 and then eventually 5.2 million, what    4:48PM
6  would that leave the bank with in terms of loan
7  to value on the remaining properties that it held
8  collateral for?
9  A      It would have left the bank around two and
10 a half million.  If they could have closed on all   4:48PM
11 these, what would they have left; is that what
12 you're saying?
13 Q      Yes, sir.
14 A      Yeah.  Yeah, two and a half million
15 dollars' worth of property free and clear.          4:49PM
16         THE COURT:  Which would be what loan to
17 value --
18         MR. RAYMENT:  Yeah, I'm --
19         THE COURT:  -- on the 14 properties?
20         MR. RAYMENT:  Right.                         4:49PM
21 Q   (By Mr. Rayment)  If you closed on the 38
22 properties --
23 A      Correct.
24 Q      -- at 4.8 or 5.2, which they were allowed
25 to do --                                             4:49PM

1  A      Uh-huh.                                            4:49PM
2  Q      -- that would have left, I guess, according
3  to the Plaintiff's position, 100,000 or so still
4  owed?
5  A      Yes.                                              4:49PM
6  Q      And what would their loan to value be at
7  that point in time?
8  A      95 percent or something, 90 percent.  I
9  can't do the math right now, but it's very high.
10 Q      But, in essence, they'd have about               4:49PM
11 $9 million of value against a 100,000 debt?
12 A      No, they'd have two and a half million.
13 Q      I'm sorry, just on their properties?
14 A      Yeah.  They'd have two and a half million
15 with $100,000 worth of debt so --                        4:49PM
16 Q      Have the taxes and insurance been paid on
17 these properties by you?
18 A      Yes.
19 Q      Is the Hot Coffee property proposed to be
20 paid off, is that part of this refinancing?              4:50PM
21 A      It's -- yeah, everything's supposed to be
22 paid off.
23 Q      Mr. Nguyen, I'm going to hand you what I've
24 marked as Defendant's Exhibit 4.  Can you tell
25 the Court what this document is?                          4:50PM

1  A     It's an e-mail from -- between First                      4:51PM
2  Bank & Trust and Certain Lending.
3  Q     And who is Adam Hosn that's authoring this?
4  A     He is -- he works for Certain Lending.
5  He's a loan officer.                                            4:51PM
6  Q     Mr. Nguyen, I've handed you Defendant's
7  Exhibit 5.  What is this document?
8        MS. GEORGE:  Your Honor, I'm going to
9  object to the Defendant's testimony about either
10 of these e-mails.  He's not in either of these          4:52PM
11 e-mails.  I assume he can read them to the Court,
12 just like the Court can, but I don't think
13 they're admitted, and I think him reading them
14 into the Court kind of defeats the purpose of
15 having the person who wrote the e-mail here.  So         4:52PM
16 objection.  Hearsay.
17        MR. RAYMENT:  Your Honor, I was trying
18 to avoid having to call Counsel to the stand
19 because she's the recipient of these e-mails.
20        THE COURT:  Object.  I'm going --              4:52PM
21 nobody's moved to admit them, anyway.
22        MR. RAYMENT:  I get that.
23        THE COURT:  I mean, we haven't -- you
24 haven't done that.  He's just testifying as to, I
25 don't know, that there's some e-mails between          4:52PM

1    Mr. Hosn and Miss George about the refinancing.      4:52PM
2    So go ahead, Mr. Rayment.   Objection overruled at
3    this point.
4          MR. RAYMENT:   Your Honor, I'll go ahead
5    and move to admit No. 4.                              4:53PM
6          MS. GEORGE:   And I would raise my
7    objection, Your Honor.
8          THE COURT:   Well, for the purposes of
9    this hearing and the content of this e-mail,
10   either way, Exhibit No. 4 will be admitted.           4:53PM
11   Q   (By Mr. Rayment)  Mr. Nguyen, turning to
12   Exhibit 5, Defendant's Exhibit 5, the first --
13   well, first of all, let's look down below.  Is it
14   your understanding that the bank was insisting
15   that 100 percent of the loan payoff, including        4:53PM
16   default interest, costs and fees, be included and
17   paid at closing?
18   A    Can you ask that again?
19   Q    Yeah.
20        Is it your understanding that the Plaintiff      4:54PM
21   was insisting upon payment of all outstanding
22   loan balances, interest, and attorney's fees as a
23   part of this closing?
24   A    I didn't know that they -- what fees -- I
25   didn't know the fees, but, yes, I understood that     4:54PM

1   there were fees.                                          4:54PM
2   Q      And the spreadsheet that was sent by
3   Certain Lending showed that they weren't going to
4   be advancing 100 percent of the payoff amount to
5   the bank; is that correct?                               4:54PM
6   A      Yeah, it was short $100,000.
7   Q      And --
8   A      100 and some.
9   Q      And is this exhibit, Exhibit 5, Certain
10  Lending's response to the concerns being raised          4:55PM
11  by Counsel for the Plaintiff about not getting
12  100 percent of the proceeds?
13  A      Yes.
14  Q      And in this e-mail does he advise Counsel
15  that there will be cash brought to closing by            4:55PM
16  yourself?
17  A      Yes.
18  Q      Have you sought out other lending sources
19  besides Certain Lending?
20  A      I didn't until just as of very, very             4:55PM
21  recently because of the problems they were having
22  trying to get these things closed so -- but, yes,
23  I have.
24  Q      Counsel had put in front of you Plaintiff's
25  Exhibit 20, which was a loan approval by ASAP            4:55PM

```
 1  Approval.                                          4:55PM
 2  A     Yes.
 3  Q     Do you recall that?
 4  A     Yeah.  I know it, yes.
 5  Q     If you were to proceed with this ASAP      4:56PM
 6  Approval loan, would you have more than
 7  sufficient funds to pay off the bank?
 8  A     Yeah, I'd have a million and a half.
 9  Q     And I understood from your earlier
10  testimony that you have cash capital available to  4:56PM
11  you to raise this difference anyway; is that
12  correct?
13  A     Yes.
14        MR. RAYMENT:  Your Honor, I would go
15  back and move for admission of Defendant's         4:56PM
16  Exhibit 5.
17        MS. GEORGE:  Is that the second e-mail?
18        MR. RAYMENT:  Yes.
19        MS. GEORGE:  Same objection, Your Honor,
20  but I don't have a problem with the Court taking   4:56PM
21  notice of those.  You can interpret those as you
22  see fit.
23        THE COURT:  Okay.  Defendant's
24  Exhibit 5, we will go ahead and admit it.
25  Q   (By Mr. Rayment)  Mr. Nguyen, how much        4:57PM
```

1   value -- net value do you have in Nguyen Win          4:57PM
2   Properties various real estate holdings over and
3   above what's owed to the Plaintiff, assuming
4   their claims are found to be accurate?
5           MS. GEORGE:  Objection, Your Honor.  I       4:57PM
6   think we talked about this earlier.  He hasn't
7   provided anything showing that his determination
8   of value is accurate.
9           THE COURT:  Sustained.
10  Q   (By Mr. Rayment)  How many properties do you    4:57PM
11  have that are not pledged to First Bank?
12  A     About 100, a little more.
13  Q     Have you sought loans on any of those at
14  this time or do you even need to?
15  A     No, I don't need to.                           4:58PM
16          MR. RAYMENT:  That's all I have, Your
17  Honor.  Thank you.
18          THE COURT:  Okay.  Redirect?
19          MS. GEORGE:  I'll be quick, Your Honor,
20  because I --                                         4:58PM
21          THE COURT:  Hang on.  All right.  Go
22  ahead.
23          MS. GEORGE:  Thank you, Your Honor.
24  Just a few follow-up questions.
25                                                       4:58PM

1          <u>**REDIRECT EXAMINATION**</u>                    4:58PM

2  BY MS. GEORGE:

3  Q     James Davis was your lender; correct?

4  A     He was my loan officer.

5  Q     And you stated earlier that you thought          4:58PM

6  maybe he was terminated.  Do you have any

7  knowledge as to whether he was terminated or

8  whether he went to a different bank?

9  A     I was told by somebody at the bank that he

10 was no longer there and that he wasn't going to    4:58PM

11 be back, is my understanding.

12 Q     So you don't know whether he was terminated

13 or whether he just left?

14 A     I do not.

15 Q     Okay.  And you stated earlier that you          4:59PM

16 would make mobile deposits.  Is that like online

17 banking on your phone?

18 A     Correct.

19 Q     Are you able to see your loans on online

20 banking?                                            4:59PM

21 A     I guess I would be if I signed up onto it,

22 yes.

23 Q     Okay.  And so you would be able to log into

24 online banking and see, if you were signed up for

25 it, that your notes had payments due?              4:59PM

1  A     I was specifically told by James that he      4:59PM

2  was taking care of my accounts, and I had no

3  other reason to believe that he wasn't because he

4  did do that for three years and had no problem.

5  Q     Did you execute the promissory notes that     4:59PM

6  I've put in front of you today?

7  A     I wasn't allowed to.

8  Q     No.  Did you sign the promissory notes?

9  A     Oh, to execute them?

10 Q     Yes.                                           4:59PM

11 A     Yes.

12 Q     And you understand that each of those

13 promissory notes have the payment terms set forth

14 within the promissory notes; correct?

15 A     Yes.                                           5:00PM

16 Q     Okay.  And so you knew what your monthly

17 payments were going to be or when you had a lump

18 sum payment come due pursuant to the terms of the

19 note, didn't you?

20 A     I knew how much my payment was, yes.           5:00PM

21 Q     Okay.  And you are ultimately responsible

22 under the promissory notes to make those

23 payments; correct?

24 A     Yes.

25 Q     Okay.  The bank does not have an obligation    5:00PM

1  to send you a monthly payment reminder, does it?     5:00PM
2  A     They -- he insisted on it.
3  Q     But the bank does not have a contractual
4  obligation to remind you every month or make your
5  payment for you?                                      5:00PM
6  A     They have one to make me aware that mine's
7  not getting paid.
8  Q     But you're aware of that pursuant to the
9  promissory notes that state the monthly payment
10 amounts that you're supposed to make; correct?        5:00PM
11 A     Correct.
12 Q     Okay.  In the business loan agreement, if
13 you've got that in front of you, I walked you
14 through the notice provision earlier.
15 A     Uh-huh.                                          5:01PM
16 Q     At the front of that loan agreement it's
17 got a borrower name and address -- and this is
18 the document you signed.  Nguyen Win Properties,
19 3220 South Knoxville Avenue, Apartment 8.  That's
20 the address listed on this loan agreement.  Is        5:01PM
21 that not your address?
22 A     No, it is not.
23 Q     Okay.  And when you signed this loan
24 agreement that was the address that was on here?
25 A     When was it signed?                              5:01PM

1  Q     This one was signed May 2nd of 2022?                    5:01PM
2  A     Yes, it was.
3  Q     Was that accurate at that time?
4  A     That was, yes.
5  Q     And when we look back at the notice                     5:01PM
6  provision on page five, I think you said that it
7  was Summer that you told over the phone to change
8  your address?
9  A     I didn't tell her -- I didn't tell anybody
10 to change my address.  Like, what do you mean?        5:01PM
11 Q     Okay.  So who did you notify at the bank
12 that your address changed?
13 A     James knew my address changed.
14 Q     Okay.  Let's look at page five under the
15 notice provision.                                      5:01PM
16 A     Uh-huh.
17 Q     I'm going to read the sentence immediately
18 before the one I read before.
19 A     Yes.
20 Q     Any party may change its address for              5:01PM
21 notices under this agreement by giving formal
22 written notice to the other parties, specifying
23 that the purpose of the notice is to change the
24 party's address.  You never did that, did you?
25 A     I told James that I had a change of               5:02PM

1   address.                                                     5:02PM
2   Q      Okay.  Did you give formal written notice
3   to the bank of your change of address from the
4   address listed on the business loan agreement?
5   A      I don't recall.                                       5:02PM
6   Q      Your counsel asked you earlier about
7   accounting that you asked for from the bank.  And
8   your testimony was the bank never provided that;
9   is that correct?
10  A      The bank -- no, the bank made me pay for             5:02PM
11  statements.
12  Q      Okay.
13  A      Made me do it myself.
14  Q      I'll hand you what we'll mark as
15  Exhibit 23.  This is an e-mail to your attorney.            5:02PM
16  Did he provide -- that I sent to your attorney.
17  Did he provide this to you?
18  A      Oh, yeah.  So --
19  Q      That was my question.  Did you receive this
20  document?                                                   5:03PM
21  A      Correct.
22  Q      Okay.  And so this is where he responded to
23  your very specific request for accounting and
24  addressed a number of issues that you raised, and
25  this was provided to your attorney in response to          5:03PM

1  the request for accounting; correct?                    5:03PM
2  A    It was provided and it was incorrect.
3  Q    Okay.  But we -- you disagree with it, but
4  we did provide a response to your request for
5  accounting; correct?                                    5:03PM
6  A    An incorrect response, yes.
7  Q    Okay.  But it's untrue that we did not
8  respond to your request for accounting; you just
9  disagree with it?
10 A    Can you repeat?                                     5:03PM
11        MR. RAYMENT:  Objection, Your Honor.
12 Argumentative.
13        MS. GEORGE:  It's fine.
14        THE COURT:  You can withdraw the
15 question.                                                5:03PM
16        MS. GEORGE:  I'll withdraw the question.
17 Q   (By Ms. George)  You also testified that you
18 don't -- you weren't provided the attorney's
19 fees.  Are you aware that your counsel asked me
20 for a copy all of our statements to justify the          5:03PM
21 attorney's fees?
22 A    I didn't know he did.
23 Q    Okay.  Are you aware that I provided those
24 to him within 48 hours of his request?
25 A    Great.                                              5:04PM

110

```
1          MS. GEORGE:  Okay.  Mr. Rayment, do you          5:04PM
2   want to stipulate that I provided you those
3   statements or do I need to call you to the stand?
4          MR. RAYMENT:  No, we got statements a
5   month and a half ago.  We don't have anything          5:04PM
6   showing what you're asking to get in this final
7   payoff.
8          MS. GEORGE:  But when you asked me for
9   bank -- for our detailed entries and expenses, I
10  provided those to you; correct?                         5:04PM
11         MR. RAYMENT:  At that time.
12         MS. GEORGE:  Have you requested them
13  from me since?
14         MR. RAYMENT:  At that time.
15  Q    (By Ms. George)  So the allegation -- the         5:04PM
16  question asked of you that we refused to provide
17  our attorney's fees, that is inaccurate; correct?
18         MR. RAYMENT:  Objection, Your Honor.
19  It's argumentative.  They were provided months
20  ago.  We don't have a current number that they're      5:04PM
21  asking to be paid.
22         THE COURT:  Overruled.  She's just
23  asking him if he is aware.
24         MS. GEORGE:  The only other thing, Your
25  Honor, and I'm happy to ask him this, but to           5:04PM
```

111

1  expedite it, the mortgage on page three has the            5:04PM
2  due on bill consent by lender provision where it
3  talks about upon sale or transfer that the
4  proceeds should be paid over.  I just wanted to
5  note that for you.  With that, I don't have any           5:05PM
6  further questions.  Actually, I have one further
7  question.
8  Q    (By Ms. George)  Do you see this stack right
9  here?
10 A    Sure.                                                5:05PM
11 Q    This is e-mails starting back in May
12 through -- up through last night of us trying to
13 work with your lender to try to get this closed.
14 Do you have an understanding we've been working
15 directly with them for months?                            5:05PM
16 A    I have an understanding that you guys have
17 talked and you guys cannot get an agreement done,
18 and you won't accept anything that they have to
19 offer, yes.
20 Q    And you testified earlier that you have              5:05PM
21 cash that you could bring to the closing
22 sufficient to pay off the full balance of the
23 bank.  Do you have proof of that here today
24 beyond the bank statement that I've put in front
25 of you?                                                   5:05PM

1  A      I have my statement on my phone, yeah.  I          5:05PM
2  can pull it up, current balance.
3  Q      I'll let your counsel see if he wants to
4  walk you through that.  Absent an exhibit, I --
5  we don't have proof of that payment; so -- I          5:06PM
6  don't have any further questions.
7           THE COURT:  All right.  Mr. Rayment?
8           MR. RAYMENT:  Nothing further for this
9  witness, Your Honor.
10          THE COURT:  Mr. Rusher, I assume you          5:06PM
11 didn't have any.
12          MR. RUSHER:  I have nothing further,
13 Your Honor.
14          THE COURT:  Go ahead and have a seat,
15 Mr. Nguyen.  You may step down.          5:06PM
16          Miss George, did you have any further
17 witnesses?
18          MS. GEORGE:  No further witnesses, Your
19 Honor.
20          THE COURT:  Okay.  And all exhibits that          5:06PM
21 you wanted before the Court are admitted.
22          MS. GEORGE:  Yes, Your Honor.
23          THE COURT:  You don't have anything
24 else?
25          MS. GEORGE:  (Attorney shakes head.)          5:06PM

```
 1            THE COURT:  All right.  And,          5:06PM
 2  Mr. Rayment -- I'm sorry, do you rest?
 3            MS. GEORGE:  Yes, I would just make a
 4  short summary argument at the end.
 5            THE COURT:  Mr. Rayment, have you done  5:06PM
 6  all the things that you wanted to do or did you
 7  have anything else that you wanted to present?
 8            MR. RAYMENT:  I have no other evidence
 9  to offer, Your Honor, but I would move to dismiss
10  their claim for receiver based upon the --       5:07PM
11            THE COURT:  She hasn't given her
12  argument yet.
13            MR. RAYMENT:  I'm sorry.
14            THE COURT:  She has not given her
15  argument yet.  I will hear -- she wanted to give  5:07PM
16  a short summation; so I'll let her do that and
17  then you can respond.
18            MR. RAYMENT:  Very good.
19            MS. GEORGE:  Very briefly, Your Honor,
20  as I know you have seen the briefs in this case   5:07PM
21  and you are familiar with receiverships.
22            As set forth in our brief, Your Honor,
23  we are seeking a receivership on the allegation
24  that the properties are in danger of being lost,
25  removed or materially injured.  We've proven that 5:07PM
```

1  the loans are all in default, have been for quite  5:07PM
2  some time.  Rents conditioned to come in but
3  they've not been paid over to the bank.  The
4  folks that you heard from today are a very small
5  example of the number of phone calls that my  5:07PM
6  office has received.
7          MR. RAYMENT:  Your Honor, I'm going to
8  object to that.  This is attempting to offer
9  additional evidence without being sworn.
10          THE COURT:  Sustained.  Go ahead.  5:08PM
11          MS. GEORGE:  I'm happy to rely fully on
12  the testimony provided here today that clearly
13  demonstrates that the properties that are subject
14  to this mortgage are in danger of being lost,
15  removed or materially injured.  You've heard  5:08PM
16  sufficient evidence on that issue.  You've heard
17  how the borrower has failed to maintain the
18  properties despite knowing that they have damage.
19  You've also heard that one of the properties --
20  one of the larger properties, the apartment  5:08PM
21  complex, was transferred out of trust without
22  paying the bank's loan off.
23          I have not encountered a case more
24  compelling for the appointment of a receiver than
25  the one before you today, which clearly  5:08PM

1  establishes under 12 O.S. 1551 that the mortgaged          5:08PM
2  properties are absolutely not only in danger of
3  being lost, removed or materially injured, they
4  are already there.  And the only way to get these
5  properties under control, because of the volume          5:08PM
6  of them and because of the contracts for deed and
7  all the various parties involved, is the
8  appointment of an independent party to be able to
9  come back and report to the Court and let you
10 know which properties have folks living in them,          5:09PM
11 let you know which properties have damage.
12          This is going to be a massive
13 undertaking for a receiver, and they're going to
14 have to hire a lot of help to do it.  But it's
15 clear that the borrower is not capable of          5:09PM
16 maintaining these properties, and we need court
17 intervention in order to protect our collateral,
18 and frankly, to protect the folks that are living
19 in these homes.
20          I think the evidence has shown you from          5:09PM
21 the different people who have testified today
22 that this is a predatory lender that has
23 approached and entered into agreements with the
24 needliest people in our society, having them sign
25 documents to pay their money, not recording their          5:09PM

1 contracts for deed, which impacts their interest            5:09PM
2 in the property.  And when they're one day -- and
3 then taking their money but not paying it over to
4 the bank and putting himself in a default
5 situation where there's foreclosures and there's         5:09PM
6 folks living in these home that are in disrepair.
7        We would urge the Court that this --
8 this has become a dire situation, much more so
9 than we even realized when we filed this request
10 for receivership initially as it has unfolded          5:10PM
11 under the last several months.  We were hoping to
12 obtain financing, and we have worked really hard
13 to try to do that.  It has continued to be
14 promised and then doesn't happen, week after
15 week, and so we are left with no choice but to         5:10PM
16 seek this relief from the Court.
17        I do have our receiver here today.  If
18 the Court has any questions for our proposed
19 receiver, she would be happy to answer those.
20 But she is here and ready to sign the oath upon         5:10PM
21 entry of order, which we have the order and the
22 oath ready, Your Honor.
23        THE COURT:  Who is your receiver?
24        MS. GEORGE:  Carrie McEntire.
25        THE COURT:  Okay.          5:10PM

1          MS. GEORGE:  And again, if you have any          5:10PM
2   questions for her, we'd be happy to -- a copy
3   of -- a short copy of her resume was attached to
4   our application upon receiver.  Thank you, Your
5   Honor.                                                 5:10PM
6          THE COURT:  Okay.  Mr. Rayment?
7          MR. RAYMENT:  Your Honor, the only
8   evidence of property deteriorating has been
9   offered by people who signed to purchase the
10  property under a contract for deed and assumed      5:11PM
11  the responsibility for maintaining the property.
12  There's been no evidence offered as to how much
13  it's going to take to repair those properties.
14  There's been no evidence offered that my client
15  was responsible for doing the repairs on those     5:11PM
16  properties.  What we do have is we've got a new
17  prospective lender ready to close that has
18  approved the values on those properties and
19  willing to advance enough money on part of the
20  collateral of the bank in order to raise enough    5:11PM
21  money to pay them off.  And you can see from this
22  exhibit, we're talking about next week.
23          I was really shocked, frankly, that
24  we're even going to be here today for a
25  receivership hearing when we've got a pending      5:11PM

1  closing ready to happen and everybody can be paid        5:11PM
2  off.  What's the point of having a receiver go in
3  and get the middle of all this when we've got a
4  lender ready to take the bank out?  Why would
5  they even want that?  To me, Your Honor, this is        5:12PM
6  a court of equity.
7          And if I may -- I provided a copy of
8  this to Counsel -- this is the case of *Panama*
9  *Timber Company versus Barsanti*.  And it stands
10 for the proposition -- actually, there's two main       5:12PM
11 points that I want to point the Court to.  Under
12 No. 2, the power to appoint of receiver is a
13 delicate one and should be exercised with extreme
14 caution.  The second one is under No. 5,
15 insolvency of the mortgage or a loan is not             5:12PM
16 grounds for appointment of a receiver.
17 Insolvency must be coupled with the evidence that
18 the security is insufficient to satisfy the debt.
19         They've offered no evidence -- they
20 complain about us not offing values.  They              5:13PM
21 haven't offered any evidence as to the value of
22 these properties.  We have because we've offered
23 evidence of the new lender willing to lend enough
24 money on them.  So you have evidence of value.
25 You have evidence that the value is more than          5:13PM

1  sufficient to cover their debt, and they failed          5:13PM
2  to establish that the collateral is insufficient
3  to cover their debt.  And for that reason alone,
4  Your Honor, this receivership should be denied.
5          And I would ask the Court to consider          5:13PM
6  that.  And I would also ask the Court to consider
7  withholding a ruling on this motion to see if
8  this loan ultimately does close next week.
9  Because if it closes --
10          THE COURT:  What's your closing date?        5:13PM
11          MR. RAYMENT:  It's the 4th through 18th.
12          THE COURT:  That's the range.
13          MR. RAYMENT:  The 4th through the 18th
14  because they're closing them --
15          THE COURT:  In a range.                        5:14PM
16          MR. RAYMENT:  -- in different -- it's
17  actually the title company that has trouble
18  closing that many at one time because of their
19  payment order.
20          THE COURT:  Anything else, Mr. Rayment?       5:14PM
21          MR. RAYMENT:  No, Your Honor.  That's
22  all.
23          MR. RUSHER:  Your Honor, if I may
24  briefly say as to my client on the one piece of
25  property, the testimony has been that it's not    5:14PM

1  under the control of the Defendant, and my client          5:14PM
2  is maintaining it.  And they are managing that
3  property.  There's been no testimony about it
4  being in a state of disrepair or anything.  We
5  would ask the receiver not be appointed to take          5:14PM
6  over our client.  We are making payments, as you
7  heard the testimony, to Nguyen Win Properties.
8  If you want to direct those payments be made to
9  some other source, we don't have a problem with
10 that.  We just ask that a receiver not be               5:14PM
11 appointed to take over my client -- my client's
12 property.
13         THE COURT:  Okay.  Miss George, anything
14 in reply?
15         MS. GEORGE:  As I stated earlier, Your           5:15PM
16 Honor, we're not moving under the subsection that
17 requires us to show insolvency in value.  That is
18 under Section 12 O.S. 1551 2(b).  We are moving
19 under Section (a), where it appears the mortgaged
20 property is in danger of being lost, removed or          5:15PM
21 materially injured.  I do think we also satisfy
22 B, Your Honor, especially where all the evidence
23 from the lender shows that the payoff is not
24 going to be sufficient to pay the value of the
25 loans in full.  So for that reason, Your Honor,          5:15PM

1  we believe a receiver is appropriate and                   5:15PM
2  certainly warranted under the law.  I understand
3  if Your Honor is inclined to enter this after
4  that closing date, but I would ask that it be
5  entered very promptly, within days of those -- of   5:15PM
6  those proposed closings.  That would give us time
7  to work with Counsel for Hot Coffee Homes to put
8  an order together that would address that
9  property specifically.  But we would ask for a
10 ruling today, Your Honor, that a receivership       5:16PM
11 will be ordered if these don't close by a date
12 certain.  That would be the request for relief
13 that we would ask for if you're not inclined to
14 enter it today.
15         THE COURT:  Okay.  The Court is very         5:16PM
16 mindful of the caution that should be used in
17 appointing a receiver.  The Court's concern today
18 is, one, the volume of property that are under
19 mortgage, the testimony from some of the contract
20 for deed holders as to the condition of their       5:17PM
21 property regardless of -- I don't know what it
22 said in the contract for deed.  I don't know -- I
23 do know though that what a contract for deed is,
24 and it's not an outright sale of the property.
25 We all know that, of course.  And so at some        5:17PM

1  point if Mr. Nguyen wants to, he can take the          5:17PM
2  property back.
3          The property is under the -- the
4  business loan agreement, the properties are.
5  There are obligations that the borrower has to          5:18PM
6  the lender, that being the Plaintiff, and
7  testimony to the Court was very concerning
8  regarding the lack of diligence exercised by the
9  borrower, the Defendant in this case, regarding
10 his obligations and responsibilities.  Certainly,       5:18PM
11 I mean, it's a very basic issue of getting an
12 address changed.  I was surprised to hear
13 testimony regarding payment of the loans and the
14 arrangements that apparently were made between
15 Mr. Davis and the Defendant.  I'll just leave it        5:19PM
16 at that.  I think that's not -- not knowing some
17 of these details regarding payments and things
18 was very surprising to the Court.
19         So had there not been -- had there not
20 been any testimony -- I'll just say this, had           5:19PM
21 there not been any testimony regarding the loan
22 from Certain Lending, there would absolutely be a
23 receivership put in place today, right now.  I
24 don't know what is going on.  Certain Lending is
25 willing to loan -- at this point now, I guess we        5:20PM

 1  heard testimony, over $5 million, but not a                    5:20PM
 2  remainder of $100,000 to completely take out the
 3  bank.  And the bank does not owe any obligation
 4  to work with the borrower under these
 5  circumstances.  The terms of the payments in the               5:20PM
 6  loan agreements are what they are.  And, of
 7  course, they have tried to work with the
 8  borrower.  And I, again, don't understand why
 9  there's this big issue of $100,000 in light of
10  the overall amount to be loaned, but I am willing             5:20PM
11  to wait and see if that can occur because I think
12  that that is the appropriate thing under the
13  circumstances.  If Mr. Nguyen is able to secure
14  the complete financing and -- to buy out the bank
15  then, I mean, under the law that's what he's                   5:21PM
16  allowed to do.  Gosh, I -- I don't know if it's
17  going to work, but I guess we'll see; so --
18          MS. GEORGE:  What I might request, Your
19  Honor, to assist you, could we have a status
20  conference set with you, maybe even by Teams, for              5:21PM
21  some date next week following the dates of these
22  closings so that we can either have an order
23  entered then or --
24          THE COURT:  So here's my proposal.
25  Let's see, November 24th is the Monday before                  5:21PM

1   Thanksgiving, and that is, what, six days, eight        5:22PM
2   days after -- six days after the last day of the
3   window for the closing; right?
4           MR. RAYMENT:  Yes.
5           THE COURT:  Okay.  So we have a little          5:22PM
6   weekend in between there.  So if the closing has
7   not gone through, then I would ask that the
8   receiver please be back here, Miss McEntire, to
9   receive your oath to proceed with the
10  receivership.  So I don't think we need a status       5:22PM
11  conference.  There's just this is the date.  So
12  either the loan goes through and there's a full
13  release of the properties or it doesn't.  And if
14  there's not, then Miss McEntire will be sworn in
15  to be the receiver over the properties with the        5:23PM
16  exception of the apartment building that was
17  transferred, and shouldn't have been, to HCH, Hot
18  Coffee Homes.  As long as Hot Coffee Homes is
19  taking care of their business, I don't see any
20  reason for them to be in the receivership.  But        5:23PM
21  Hot Coffee Homes I think will have to -- I mean,
22  there's an already an assignment of rents in
23  place that's not happening.
24          MS. GEORGE:  And, Your Honor, we can
25  memorialize that and have Hot Coffee Homes take        5:23PM

```
 1  care --                                              5:23PM
 2          THE COURT:  I feel like you and
 3  Mr. Rusher can get that accomplished --
 4          MS. GEORGE:  Yes, Your Honor.
 5          THE COURT:  -- to have them to operate     5:23PM
 6  outside of the umbrella of the receivership.
 7          MS. GEORGE:  But for the proceeds to be
 8  paid over into the receivership.
 9          THE COURT:  Yes.
10          MS. GEORGE:  I'm sorry, their payment.    5:24PM
11          THE COURT:  Yes.
12          MS. GEORGE:  Just to clarify.  Thank
13  you, Your Honor.
14          THE COURT:  So that's the Court's order.
15  Miss McEntire, are you available on that date or  5:24PM
16  is that posing a conflict?
17          MS. MCENTIRE:  I am actually going to be
18  traveling that week for the holidays.
19          THE COURT:  Okay.
20          MS. MCENTIRE:  So I am wondering if the   5:24PM
21  Court would be amenable to me taking the oath
22  today in anticipation of entry of that oath or I
23  could, you know, take the oath virtually by
24  Teams.
25          THE COURT:  We can take the oath          5:24PM
```

1  virtually, if that works for you.                         5:24PM

2          MS. McENTIRE:  That works fine.

3          THE COURT:  Okay.  So you'll just need

4  to coordinate with my bailiff so she can set it

5  up, that Teams meeting, so we can do that.  It          5:24PM

6  takes, you know, a couple of minutes, so --

7          MS. McENTIRE:  Thank you, Your Honor.

8          MS. GEORGE:  And, Your Honor, with

9  respect to the order granting the receivership

10 that would also need to be entered simultaneous         5:24PM

11 with the oath, I don't want to get in a situation

12 where the attorneys can't agree on the content of

13 that receiver's order and we have to set a motion

14 and do a motion to settle and all of that.  How

15 do you want to pre-resolve any concerns there?         5:25PM

16         THE COURT:  So do you have an order?

17         MS. GEORGE:  I do have an order, Your

18 Honor.  It obviously doesn't --

19         THE COURT:  Have you shared it with

20 counsel?                                                 5:25PM

21         MS. GEORGE:  No, I brought it for today.

22 I'm happy to do that.

23         THE COURT:  Share that with Mr. Rayment.

24 If Mr. Rayment does not have objections, that's

25 fine.  If Mr. Rayment has any objections, then          5:25PM

1  we'll take that up on the 24th.                    5:25PM

2          MS. GEORGE:  Okay.  Thank you, Your

3  Honor.  And we'll work with Hot Coffee Homes to

4  revise it with respect to that issue.  But we

5  will -- if we see that we're going to have an      5:25PM

6  objection, we'll contact the Court in advance of

7  the 24th in regard to that.

8          MR. RAYMENT:  Your Honor, what time

9  would that be on the 24th?

10         THE COURT:  So the only other thing that   5:26PM

11 I -- I think that takes care of that -- I think

12 that takes care of pretty much everything, but

13 again, I'm going to reiterate that I heard some

14 extremely concerning things today about what's

15 going on with these properties that I hope are     5:26PM

16 rectified in some form or fashion.

17         Let's do 2:30.  Is that okay?

18         MS. GEORGE:  I sincerely hope that we do

19 not see you on the 24th, but I have got it down.

20         THE COURT:  Me, too.  I hope that things   5:27PM

21 go through and that the loan is paid and you all

22 can be separated.

23         MS. GEORGE:  Thank you for your time and

24 attention, Your Honor.

25         THE COURT:  Yes.                            5:27PM

1        MR. RAYMENT:  Thank you, Judge.                    5:27PM

2             *(whereupon, the hearing was concluded*

3  *at 5:27 p.m.)*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2  State of Oklahoma   )
                        ) ss
3  County of Tulsa  )

4          I, Nichole M. Myers, a Certified

5  Shorthand Reporter within and for Tulsa County,

6  State of Oklahoma, do hereby certify that the

7  hearing was held in the case aforesaid, and that

8  I reported in stenograph the hearing; that my

9  stenograph notes were thereafter transcribed and

10  reduced to typewritten form under my supervision,

11  as the same appears herein.

12          I further certify that the foregoing

13  127 pages contain a full, true and correct

14  transcript of the hearing taken at such time and

15  place.

16          I further certify that I am not

17  attorney for or relative to either of said

18  parties, or otherwise interested in the event of

19  said action.

20          WITNESS MY HAND AND SEAL this 1st day

21  of December, 2025.

22

23          _____
            NICHOLE M. MYERS, RPR
            CSR NO. 1704
24

25