**Dated: September 4, 2026**

**The following is ORDERED:**

PAUL R. THOMAS
UNITED STATES BANKRUPTCY JUDGE

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **IN RE:**<br><br>**NGUYEN WIN PROPERTIES LLC,**<br><br>**Debtor.** | **Case No. 25-11795-T**<br>**Chapter 11** |

**<u>ORDER DISMISSING CHAPTER 11 CASE</u>**

THIS MATTER comes before the Court pursuant to the Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b) (the "Motion"),[1] filed by First Bank & Trust Co. (the "Bank"); and a Response and Objection,[2] filed by Nguyen Win Properties LLC ("Debtor"). The Court held an evidentiary hearing on the Motion on August 25, 2026 (the "Hearing"). After receiving evidence and hearing argument, the Court took the Motion under advisement. The following "Findings of Fact" and "Conclusions of Law" are made pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to this contested matter pursuant to Federal

---

[1] ECF No. 410.
[2] ECF No. 444.

Rule of Bankruptcy Procedure 9014. For the reasons set forth below, the Court finds that the case should be dismissed.

**Jurisdiction**

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).[3] Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). This matter constitutes a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A).

**Findings of Fact**

This case was filed by Debtor as a voluntary proceeding under Chapter 11 of the Bankruptcy Code on November 24, 2025 (the "Petition Date").[4] Debtor remains in possession of its assets and continues to operate and manage its business as a debtor in possession pursuant to §§ 1107 and 1108. Debtor purports to own and operate a portfolio of residential real estate properties that generate income in the form of rental payments and proceeds as a vendor under contracts for deed.[5] Bao Quoc Mai Nguyen, also known as Paul Nguyen ("Mr. Nguyen") is the sole owner and manager/member of Debtor and the designated representative of Debtor as a debtor in possession.[6]

Prior to the initiation of these proceedings, Debtor and Bank entered into four separate commercial loans, each secured in some way by Debtor's property. In 2025, Bank commenced a foreclosure action against Debtor and related parties in the District Court of Tulsa County,

---

[3] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[4] Petition, ECF No. 1.

[5] ECF No. 266, at 1.

[6] Designation and Acceptance of Individual Responsible for Discharging Debtor's Duties, ECF No. 80, at 3.

Oklahoma (the "State Court Action").[7] The state court ultimately determined that a receiver should be appointed, but before such receiver was sworn in, Debtor filed the instant bankruptcy case.

Bank has filed a claim for $5,075,495.82 in this case, indicating it holds an interest secured by mortgage liens on real estate.[8] Bank claims to hold mortgages secured by 48 separate properties (the "Bank Properties").[9] According to Bank, its loans are cross-collateralized across the Bank Properties.[10] Bank's mortgages include an assignment of rents clause, which defines "Rents" as "all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property."[11]

***Debtor's Post-Petition Activities***

After filing the Petition, Debtor operated its business by collecting rents from rental properties and collecting payments on properties it had previously sold via contracts for deed but on which it retained legal title ("Post-Petition Revenue"). Debtor collected the Post-Petition Revenue through several bank accounts, CashApp, Venmo, and cash.[12] On January 22, 2026, Debtor opened a DIP account at Premier Bank, N.A. (the "DIP Account"), which was then used to deposit some, but not all of the Post-Petition Revenue. As of June 30, 2026, Debtor continued to collect some payments through CashApp, Venmo, and cash that were not deposited in the DIP Account.[13]

---

[7] Case No. CJ-2025-2901, Tulsa County District Court.
[8] Claim No. 48-1.
[9] Debtor's Ex. 7.
[10] Claim No. 48-1.
[11] *Id.*
[12] Bank's Ex. 94 (ECF No. 80, at 17).
[13] Bank's Ex. 205 (ECF No. 408-1).

On December 15, 2025, Debtor filed an Initial Report[14] in which it stated that "Cash collateral **will** be necessary to fund Debtors' post-petition operations" and "Debtors **have** filed a request for use of cash collateral under 11 U.S.C. § 363 of § 364."[15] In the section seeking "Identity of Cash Collateral," Debtor reported "n/a."[16] The Initial Report included a "Debtors' Section 345 Certificate" which appears to be a form soliciting information regarding Debtor's bank accounts and cash deposits in any form with any institution.[17] While the § 345 Certificate form was signed by Mr. Nguyen, it was blank. On February 6, 2026, Debtor filed an amendment to the Initial Report which was also dated December 15, 2025.[18] The amended Initial Report made the same representations regarding the necessity of cash collateral for Debtor's operations and that it had filed a request for the use of cash collateral. It also failed to identify any cash collateral. The amended Initial Report included a "Debtors' Section 345 Certificate," which was accompanied by an attachment showing Debtor continued to hold funds in First Oklahoma Bank, BMO, Cashapp, Venmo, and Paypal.[19]

Despite the statement in the Initial Reports, Debtor did not request permission from the Court to use cash collateral until April 29, 2026, and again on April 30, 2026 (the "Cash Collateral Motion").[20] In the Cash Collateral Motion, Debtor admitted that most or all of the Post-Petition Revenue is collateral of one or more of its secured creditors. Debtor requested permission "to use cash collateral of each lender to first pay that lender's adequate protection payments, insurance

---

[14] Bank's Ex. 93 (ECF No. 30).
[15] *Id*. at 10.
[16] *Id*.
[17] *Id*. at 16-17.
[18] Bank's Ex. 94 (ECF No. 80).
[19] *Id*. at 16-17.
[20] ECF No. 262. An Amended Motion to Use Cash Collateral was filed on April 30, 2026. ECF No. 266.

and taxes on the property(ies) claimed to be securing that creditor(s) claim(s)" and for permission to use any excess funds for general operating expenses.[21] Several creditors objected to the Cash Collateral Motion, and it was ultimately withdrawn at the Hearing. With the exception of several agreements between Debtor and specific secured creditors for adequate protection payments related to their claims,[22] the Court is unaware of any permission by this Court for the use of any creditors' cash collateral for any purpose, including payment of utilities, taxes, insurance, contractors, employee salaries, or other general operating expenses.[23]

In Debtor's original Petition, it indicated it held no accounts receivable.[24] An amended petition filed on January 9, 2026, reported Debtor was owed $322,399.59 in accounts receivable less than 90 days old, and $405,408.99 over 90 days old.[25] After the Hearing, Debtor filed an additional amendment to the Petition, indicating Debtor was owed $231,133.79 in accounts receivable less than 90 days old, and $951,214.23 over 90 days old.[26] Debtor's monthly operating reports show that between December 31, 2025, and June 30, 2026 (the latest report available before the Hearing), Debtor collected a total of $573,136 in Post-Petition Revenue, and disbursed a total of $441,443.[27] The disbursements included payments for utilities, "supplies," contractors,

[21] ECF No. 266, at 2-3.

[22] *See, e.g.,* ECF Nos. 391-95, 404.

[23] At least one Agreed Order between Debtor and Citibank, N.A., as Trustee for CMLTI Asset Trust, at ECF No. 455, made reference to the payment of expenses related to a creditor's property, but it did not specifically grant permission to the Debtor to use that creditor's collateral for that purpose ("The parties understand and agree that this amount [of adequate protection payments] does not account for property taxes and hazard insurance and Debtor agrees to pay those directly and provide proof of payment to Movant as soon as these are paid.").

[24] ECF No. 1, at 6 ¶ 10.

[25] ECF No. 55, at 2 ¶ 10.

[26] ECF No. 473, at 2 ¶ 10. Given the large discrepancy between these numbers and those reported on the various monthly operating reports, the Court must assume the numbers reported on ECF No. 473 are not an accurate reflection of Debtor's accounts receivable as of the Petition Date. Therefore, the Court will not give these numbers any weight.

[27] Bank's Ex. 205 (ECF No. 408, at 2).

insurance, and employee salaries.[28] According to the monthly operating reports, while this case has been pending, Debtor's accounts receivable have grown by $269,806.[29] During that same period, Debtor's accounts receivable outstanding over 90 days have grown by at least $159,258.[30]

Mr. Nguyen, as representative of Debtor, testified at the Hearing regarding Debtor's post-petition operations. Regarding Debtor's large and growing accounts receivable, Mr. Nguyen blames Bank's litigation tactics in the State Court Action for causing many of Debtor's contract for deed counterparties to withhold payment. Mr. Nguyen did not indicate what efforts, if any, Debtor had undertaken post-petition to reassure the contract holders or to collect on the late accounts.

Debtor has not filed a disclosure statement or plan of reorganization in this case. In lieu of a plan under §§ 1121 – 1129 of the Bankruptcy Code, Debtor hopes to organize a sale of a large number of its properties, including all of the Bank Properties, to an insider, or in a few cases to the current contract for deed counterparty. As part of the proposed sales, Debtor seeks to utilize § 363(f) of the Code to sell the properties free and clear of the interests of secured creditors. Debtor promises that such a sale will generate sufficient proceeds to pay off all secured claims related to the sale properties, pay all Debtor's unsecured claims in full, allow Debtor to dismiss this case, and result in over $4 million in equity for Mr. Nguyen.

---

[28] *Id*. at 408-1.

[29] Between December 31, 2025, and June 30, 2026, Debtor's accounts receivable grew from $631,169 to $900,975. Bank's Ex. 95 (ECF No. 123, at 2); Bank's Ex. 205 (ECF No. 408, at 2).

[30] Between December 31, 2025, and June 30, 2026, Debtor's accounts receivable over 90 days outstanding grew from $528,294 to $687,552. Bank's Ex. 95 (ECF No. 123, at 2); Bank's Ex. 205 (ECF No. 408, at 2).

On June 29, 2026, the Court denied two separate motions to sell Debtor's interests in multiple properties.[31] The Court will not repeat the grounds for denial here, except to note that the Court found Debtor had not presented sufficient evidence of the viability or fairness of the sale to an insider of Debtor, had not shown it was entitled to apply § 363(f) to the proposed sales, and had not shown that § 363(b) was a proper vehicle to transfer a deed to a current contract for deed holder. On August 6, 2026, Debtor filed a Second Motion to Sell to approve sales of estate property.[32] The Second Motion sought almost identical relief as the previously denied motions without addressing the Court's most serious concerns. Although several parties filed objections to the Second Motion, it was not heard by the Court due to defective notice of the proposed hearing and failure to properly identify the proposed buyer. Debtor has since filed an Amended Second Motion to Sell (the "Amended Second Motion"), which is now pending.[33]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by reference.

**Conclusions of Law**

Section 1112(b)(1) provides in relevant part that "on request of a party in interest . . . the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause[.]"[34] Section 1112(b)(4) includes a list of examples that may constitute "cause" to convert or dismiss, but the list is illustrative, not exhaustive.[35] It is the movants burden to prove by a preponderance of the

[31] ECF Nos. 363, 364.
[32] ECF No. 426.
[33] ECF No. 460.
[34] § 1112(b)(1) (emphasis added).
[35] *In re C.M. Heavy Mach., LLC*, 671 B.R. 309, 320 (Bankr. E.D. Okla. 2025) (citing *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012)).

evidence that cause for dismissal or conversion exists.[36] If cause is established, the burden shifts to the debtor to establish that "unusual circumstances" exist that establish that dismissal or conversion is not in the best interests of creditors and the estate.[37] If no such unusual circumstances exist, the court *must* convert or dismiss the case.[38] Determining whether cause exists to dismiss or convert requires a fact-specific inquiry into debtor's post-petition circumstances.[39]

Bank asserts that cause exists for dismissal pursuant to § 1112(b)(4)(A), (B), (D), (F), and (J), for continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation; gross mismanagement of the estate; unauthorized use of cash collateral substantially harmful to one or more creditors; unexcused failure to satisfy timely any filing or reporting requirements; and failure to timely file a disclosure statement or a confirmable plan. Bank also alleges that Debtor's initial filing and continued prosecution of this case demonstrate bad faith. Although bad faith is not listed as a ground to find cause under § 1112(b)(4), it is a well-recognized basis for conversion or dismissal under § 1112(b)(2).[40]

***Unauthorized use of cash collateral substantially harmful to one or more creditors***

Cause may be established for the unauthorized use of cash collateral that is substantially harmful to one or more creditors.[41] The Bankruptcy Code defines "cash collateral" as cash or cash equivalents in which an entity other than the estate, often a secured creditor, has an interest in

---

[36] *In re Forest Hill Funeral Home & Mem'l Park*, 364 B.R. 808, 819 (Bankr. E.D. Okla. 2007) (citing *In re Muskogee Env't Conservation Co.*, 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999)).

[37] § 1112(b)(2).

[38] § 1112(b)(1).

[39] *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).

[40] *In re First Assured Warranty Corp.*, 383 B.R. 502 (Bankr. D. Colo. 2007) (citing *In re Frieouf*, 938 F.2d 1099, 1105 (10th Cir. 1991)); *In re Bowers Inv. Co., LLC*, 553 B.R. 762 (Bankr. D. Alaska 2016).

[41] § 1112(b)(4)(D).

estate property.[42] Because another entity holds an interest in the property, a debtor in possession may not use cash collateral in the operation of its business without the consent of the interest holder or permission of the court.[43] Such permission of the court must be conditioned on a finding that the interest holder's rights in the property are adequately protected.[44] In the absence of such consent or court permission, a debtor in possession is required to "segregate and account for any cash collateral in its possession, custody, or control."[45]

Debtor admits that most or all of the Post-Petition Revenue is the cash collateral of one or more secured creditors.[46] Debtor also admits that it has used this cash collateral to pay ongoing operating expenses.[47] Debtor's monthly operating reports generally support this assertion.[48] Although Debtor has reached agreements with several secured creditors regarding the payment of adequate protection, the Court is not aware of any agreement or consent to the use of any creditor's cash collateral.[49] The Court easily finds Debtor used cash collateral of several secured creditors without authorization.

---

[42] § 363(a).

[43] § 363(c)(2). *See Pena v. Manfredo*, No. 12-CV-01233, 2013 WL 4817581, at *3 (E.D. Cal. Sept. 6, 2013) ("A debtor-in-possession in Chapter 11 may not use cash collateral without permission from either the interested party or the court after notice and a hearing."), *aff'd*, 582 F. App'x 744 (9th Cir. 2014).

[44] § 363(e).

[45] § 363(c)(4).

[46] *See* ECF Nos. 266, at 1; 444, at 6 ¶ 14.

[47] *See, e.g.*, ECF No. 444, at 6 ¶ 14 ("Debtor has admitted to using cash collateral to pay creditors with loans secured by that cash collateral. . . . Debtor has also used funds that would be considered cash collateral to pay operating expenses[.]").

[48] Bank's Ex. 97 (ECF No. 132-1, at 3); Bank's Ex. 98 (ECF No. 133-1, at 3-4); Bank's Ex. 99 (ECF No. 152-1, at 2); Bank's Ex. 200 (ECF No. 315-1, at 5-7); Bank's Ex. 201 (ECF No. 316-1, at 5-7); Bank's Ex. 202 (ECF No. 360-1, at 1-2, 4-6); Bank's Ex. 205 (ECF No. 408-1, at 1-3; 408-3, at 1-3).

[49] *See Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368 (9th Cir. 1987) ("§ 363(c)(2) & (4) require that a debtor seek affirmative *express* consent from all parties involved before using cash collateral.").

A finding of cause under § 1112(b)(4)(D) also requires a showing that the unauthorized use of cash collateral was substantially harmful to one or more creditors.[50] There is little case law on the meaning of the term "substantial harm."[51] The bankruptcy court in *In re Visicon Shareholders Trust* defined "substantial" as "considerable in importance, value, degree, amount, or extent."[52]

According to the June 30, 2026, monthly operating report, Debtor has made over $440,000 in disbursements to various vendors while this case has been pending, most or all of which consisted of cash collateral of one or more secured creditors.[53] Mr. Nguyen testified that he believed Debtor could spend cash generated from a specific property towards mortgage payments, taxes, insurance, utilities, and maintenance expenses for that property without additional authorization from the Court. He did not indicate any authority or support for this position. Debtor's monthly operating reports indicate substantial expenditures every month toward mortgage payments, taxes, insurance, utilities, and contractors.[54] While some bank entries show that a particular expenditure is related to a specific property, most entries do not.[55] The Court was unable to identify any record showing that Debtor kept a log or accounting to segregate the cash collateral of each separate secured creditor or each separate property, as required by § 363(c)(4). Debtor also points to three checks totaling $9,629.53 from an insider entity owned by Mr. Nguyen

---

[50] *In re Ryan 1000, LLC*, 631 B.R. 722, 742 (Bankr. E.D. Wis. 2021) (finding debtors' unauthorized use of cash collateral, by itself, does not constitute cause for conversion under § 1112(b)(4)(D)); *In re Bowers Inv. Co., LLC*, 553 B.R. at 772.

[51] *In re Ryan 1000, LLC*, 631 B.R. at 741.

[52] 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012) (quoting *The American Heritage Dictionary* 1376 (4th ed. 2007)).

[53] Bank's Ex. 205 (ECF No. 408, at 2).

[54] *See supra* note 48.

[55] For example, on June 11, 2026, Debtor made 13 separate transfers from its DIP Account to "OK NATURAL GAS UTIL PAYMT" categorized as "Utilities." None of the payments identified a property or account number.

to Debtor, which Debtor's counsel described as "reimbursement" to the estate for expended cash collateral.[56] In the absence of a log or accounting of Debtor's use of cash collateral, it is difficult to understand how these funds were used or allocated.

The Court finds Bank has met its burden to show Debtor's unauthorized use of cash collateral has caused it substantial harm. While Debtor argues that revenue from each specific property was used to maintain that property, it does not deny that funds were also used for general operating expenses not tied to any specific property. This case can be distinguished from cases where a debtor uses cash collateral of a single secured creditor for the purpose of maintaining the secured property of that creditor.[57] This case is more akin to those where a debtor was found to use unauthorized cash collateral to pay operating expenses of the estate without separately accounting for such use, without seeking prior permission, and without segregating or accounting for the use of creditor's separate funds.[58] Here, Debtor's failure to segregate the cash collateral of each separate creditor adds to the confusion and uncertainty of whether a particular secured creditor's collateral is being protected. The Court concludes that Bank has met its burden to show that failure of Debtor to get permission for use of its cash collateral and failure to account for its

[56] Debtor's Ex. 13.

[57] *See, e.g.*, *In re Ryan 1000, LLC*, 631 B.R. at 722, where the court found no substantial harm in the unauthorized use of a single secured creditor's cash collateral for the maintenance of its secured assets.

[58] *See, e.g.*, *In re Bowers Inv. Co., LLC*, 553 B.R. at 773 ("However, the debtor has failed to account for the use of such funds over the two months it has operated in chapter 11, just as it did in Bowers # 1. Further, the debtor has not proactively sought authority to use [creditor]'s cash collateral. Its pending cash collateral motion was filed more than six weeks postpetition, and has yet to be noticed. Cash collateral motions are generally 'first day' motions filed promptly after a chapter 11 case is initiated. The debtor's reluctance to deal effectively with the cash collateral issues presented in this case, its failure to completely and accurately account for the use of cash collateral, and its continuing refusal to segregate the monthly expenses associated with [creditor]'s collateral constitute substantial harm to [creditor].").

expenditure has resulted in substantial harm to its secured interests in this case. Such a finding constitutes cause under § 1112(b)(4)(D).

***Gross Mismanagement***

Cause may be established if the movant provides sufficient evidence of gross mismanagement of the estate.[59] The Bankruptcy Code vests a debtor-in-possession with significant powers and assigns it significant responsibilities. A debtor-in-possession is required to perform the duties of a trustee, including operating the business of the debtor, preserving assets and providing accurate financial reports to "keep the Court and its creditors informed about the status and condition of its business."[60] A debtor-in-possession owes a fiduciary duty to its creditors.[61] Gross mismanagement is a breach of that duty.[62]

The Court begins this analysis by looking at the original schedules filed by Debtor at the outset of this case. Debtor initially claimed to own approximately 112 individual pieces of real estate in fee simple, despite acknowledging that many of those same properties had been sold via contract for deed to various buyers.[63] No information regarding those contracts was provided. Amended schedules filed in January 2026 presented the same information, again without detail regarding the contracts.[64] What little information is available to the Court regarding those contracts for deed has come from secured creditors and the counterparties to the contracts. Debtor has acknowledged that it holds mere legal title to many of the 112 properties identified in the Petition, but did not make any effort to amend the Petition to correct the nature of its interest in those

[59] § 1112(b)(4)(B).
[60] *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007). *See also* §§ 704(a), 1106(a).
[61] *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 857-58 (Bankr. S.D. Tex. 2023).
[62] *Id.*
[63] ECF No. 1.
[64] ECF No. 55.

properties until after the Hearing—over six months after the original schedules were filed.[65] Failure to promptly correct schedules indicates poor management and a lack of concern for accurate reporting to the Court and to Debtor's creditors.[66]

As of the Hearing, Debtor had still not consolidated all of its revenues into a single DIP account, and it continued to receive and hold Post-Petition Revenue in applications such as CashApp and Venmo, as well as in cash. Likewise, Debtor continued to use multiple bank accounts for several months after the Petition Date to receive and disburse estate funds. Both procedures are in direct violation of Debtor's duties as a debtor in possession under § 345.

Debtor's ongoing use of cash collateral without creditor or Court permission in violation of § 363(c)(2) also points to gross mismanagement and breaches of its statutory and fiduciary duties to creditors. In addition, an ongoing failure to segregate and account for such collateral, as required by § 363(c)(4) has made it impossible for the Court and creditors to understand the true financial condition of Debtor's business operations. Failure to comply with the Code's statutory duties, without justification, indicates gross mismanagement.

Debtor acknowledges that it has a large and growing backlog of accounts receivable, resulting from several renters and contract counterparties that have withheld payment pending the outcome of Debtor's litigation with Bank. Debtor does not appear to have made any efforts to collect these receivables. Debtor has instead chosen to pursue a misguided scheme to sell the encumbered assets to an insider and shed secured creditors' interests in those assets via § 363(f).[67] Unfortunately, Debtor has presented no authority to suggest it can use § 363(f) in this manner. Debtor has consistently failed to identify any subsection of § 363(f) that would allow it to sell

---

[65] ECF No. 473.

[66] *In re C.M. Heavy Mach.*, 671 B.R. at 321.

[67] ECF Nos. 243, 244 & 460.

property free and clear of creditors' interests without their consent.[68] Instead, Debtor has left the Court to sift through the statutory haystack to find the proverbial needle to support its proposed sale. Having determined that no such needle exists, the Court will not revisit the matter without the identification of a specific statutory provision and concrete authority supporting its application to this case. The Amended Second Motion falls far short of this standard.

In its efforts to sell assets affected by Bank's liens, Debtor has repeatedly blurred the line between the sale of real property, the sale of its contract interests in contracts for deed, and the simple execution of contracts resulting in the transfer of legal title to a property's beneficial owner. This Court denied two motions regarding the sale of such properties, and made every effort to identify fatal flaws in Debtor's approach.[69] Instead of incorporating lessons from the Court's orders, Debtor has simply filed the Amended Second Motion to renew its request on almost identical terms.[70] It appears Debtor may have gotten itself in a bind by encumbering its legal title to property that it is contractually bound to turn over to beneficial owners unencumbered. While this creates obvious legal difficulties for Debtor, it has not shown that the resolution to this dilemma lies in the Bankruptcy Code.

Given Debtor's delay in filing accurate schedules, failure to comply with its duties regarding establishment of a DIP account, failure to seek or acquire permission to use cash collateral, failure to segregate and properly account for cash collateral of multiple creditors, failure

[68] Section 363(f) provides five separate avenues to sell property free and clear of an interest of an entity other than the estate. Order Denying Motion to Approve Sale of Debtor's Interest in Real Property (related to ECF No. 243), ECF No. 363, at 18-20 (discussing each section of § 363(f)). The Amended Second Motion seeks permission to sell the estate's interest in property free and clear of liens and encumbrances of creditors, but once again fails to enumerate the specific subsection of § 363(f) on which Debtor relies.

[69] ECF Nos. 363, 364.

[70] ECF No. 460.

to collect its large and growing accounts receivable, and failure to propose a viable solution to its conflict with Bank, the Court finds Bank has met its burden to prove cause for dismissal or conversion by a preponderance of the evidence due to Debtor's gross mismanagement of the bankruptcy estate pursuant to § 1112(b)(4)(B).

***Unusual Circumstances***

Once cause to dismiss or convert a case is established, the burden shifts to the debtor to specifically identify unusual circumstances which demonstrate that dismissal or conversion is not in the best interests of creditors and the estate.[71] Courts have significant discretion to determine whether unusual circumstances exist.[72] "[U]nusual circumstances" is not defined in the Code, but is intended to include "conditions that are not common in chapter 11 cases."[73] The objecting party must *also* establish under § 1112(b)(2)(A) and (B) that there is a reasonable likelihood that (1) a plan will be confirmed within a reasonable time, (2) "cause" for dismissal includes grounds other than a continuing loss or diminution of the estate, (3) there is a reasonable justification for the act or omission that establishes grounds for dismissal, and (4) such actions will be cured within a reasonable period of time.[74]

Debtor alleges that Bank wrongfully accelerated amounts due on Debtor's notes, which triggered a crisis in both its ability to repay Bank's debt and Debtor's ability to collect from affected contract counterparties. Debtor has not articulated any conditions that are not common to

---

[71] Having determined cause exists under § 1112(b)(4)(B) and (D), the Court need not address the other enumerated elements. *See In re J.R. Butler, Inc.*, __ B.R. __, No. 25-15598, 2026 WL 1763259, at *8 (Bankr. D. Colo. June 18, 2026) ("Section 1112(b)(1) was substantially amended by BAPCPA to eliminate some of the Court's discretion and make dismissal or conversion presumptively mandatory if cause is demonstrated.").

[72] *In re Prods. Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008).

[73] *Id.*

[74] *In re C.M. Heavy Mach.*, 671 B.R. at 325.

chapter 11 cases. It is quite common for a debtor to seek relief under the Bankruptcy Code in order to gain an advantage in litigation with a secured creditor. In appropriate cases, a bankruptcy case can serve to level the playing field between a debtor and its creditors. Here, however, Debtor is seeking to expand the application of the Code beyond its appropriate use in order to gain an advantage that the drafters did not contemplate. In addition, Debtor has made clear that selling the affected assets followed by a swift dismissal of this case is its only strategy. Therefore, the Court finds there is no likelihood that a plan will be confirmed within a reasonable time. Debtor has not presented a reasonable justification for the various acts or omissions identified herein as cause, or that those will be cured within a reasonable time. Therefore, the Court finds that Debtor has failed to satisfy its burden under § 1112(b)(2).

***Conversion or Dismissal***

The Court has broad discretion to decide whether dismissal or conversion is in the best interest of creditors and the bankruptcy estate.[75] The statutory language does not refer to a debtor's best interests, and the case law construing § 1112(b) universally indicates that the debtor's interest is irrelevant.[76] Beyond arguing that no cause exists under § 1112(b), Debtor here has not taken a position on whether the case should be dismissed or converted. Bank advocates dismissal instead of conversion. While not formally joining the Motion, several other creditors indicated support for Bank's position at the Hearing.[77]

---

[75] § 1112(b)(1); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989); *In re Preferred Door Co., Inc.*, 990 F.2d 547, 549 (10th Cir. 1993); *In re C.M. Heavy Mach., LLC*, 671 B.R. at 326.

[76] *In re J.R. Butler, Inc.*, 2026 WL 1763259, at *16 (first citing *In re Sullivan*, 626 B.R. 326, 335 (Bankr. D. Colo. 2021); then citing *In re Helmers*, 361 B.R. 190, 196 (Bankr. D. Kan. 2007)).

[77] At the Hearing, counsel for Saluda Grade Income Trust I, U.S. Bank Trust National Association, not in its individual capacity but solely as trustee of Homeward Opportunities Fund Trust 2025-RRTL2, and U.S. Bank Trust National Association, not in its individual capacity but solely as trustee of Greene Street Funding Trust II, expressed support for dismissal of this case.

Given that this case began as a state court battle between Bank and Debtor, the Court finds dismissal to be the better course. The state court is well-equipped to resolve the foreclosure action between Bank and Debtor, and reportedly has a receiver waiting in the wings for that purpose. Given the paucity of unsecured debt, the Court does not find that conversion of this case to chapter 7 would do anything to advance justice or facilitate a resolution of the remaining issues between Debtor and Bank. Exercising its discretion, the Court finds that dismissal serves the best interests of creditors and the estate.

**Conclusion**

Based on the entire record, the Court finds that dismissal of this case is in the best interests of creditors and the estate under § 1112(b).

Accordingly,

IT IS HEREBY ORDERED that the Motion to Dismiss Chapter 11 Case Pursuant to 11 U.S.C. § 1112(b), filed by First Bank & Trust Co., *at ECF No. 410*, is hereby GRANTED.

IT IS FURTHER ORDERED that this case should be and hereby is dismissed with jurisdiction retained by the Court to conclude administration of the estate.

IT IS FURTHER ORDERED that the Clerk of this Court shall give notice of this Order as required under Federal Rule of Bankruptcy Procedure 2002(f)(1)(B).

###